IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ENERGYSOLUTIONS FEDERAL
SUPPORT, LLC, DERIVATIVELY ON
BEHALF OF HII SHIPCYCLE, LLC,

        *Plaintiff*,

v.

**UNITED STATES,**

        *Defendant*,

and

NORTHSTAR MARITIME
DISMANTLEMENT SERVICES, LLC,

        *Defendant-Intervenor*.

Case No.  25-1336

Judge Philip S. Hadji

█████████████████

## AMENDED COMPLAINT

Pursuant to Rule 15(a)(2) of the Rules of the United States Court of Federal Claims ("RCFC"), EnergySolutions Federal Support, LLC ("EnergySolutions"), appearing derivatively on behalf of HII ShipCycle, LLC ("ShipCycle"), amends its complaint by leave of Court. [ECF 17] at 2.

For its bid protest complaint against the United States, ShipCycle alleges as follows:

### NATURE OF THE ACTION

1.      This bid protest involves Solicitation No. N00024-25-R-4135 (the "Solicitation"), issued by the United States Department of the Navy, Naval Sea Systems Command. EnergySolutions, derivatively for ShipCycle, protests the Navy's decision to eliminate ShipCycle from the competition.

██████████████████████████████████

**PARTIES**

2.      ShipCycle is a Delaware limited liability company, housing the joint venture between EnergySolutions and HII Nuclear Inc.  EnergySolutions brings this protest in a derivative capacity on ShipCycle's behalf.

3.      Defendant is the United States, acting through the U.S. Department of the Navy.

4.      Defendant-Intervenor is NorthStar Maritime Dismantlement Services, LLC.

**JURISDICTION**

5.      The Court has jurisdiction over this suit pursuant to the Tucker Act, which gives the Court of Federal Claims jurisdiction to "render judgment on an action by an interested party objecting [1] to a solicitation by a Federal agency for bids or proposals for a proposed contract or [2] to a proposed award or [3] the award of a contract or [4] any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1)

6.      To be an "interested party" with standing under the Tucker Act, the protester must be an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract.  In a post-award protest challenging the government's elimination of a proposal from competition, the protester must show that, had its proposal been evaluated, it had a substantial chance of award.  Further, in a pre-award protest, the protester must demonstrate a non-trivial competitive injury which can be addressed by judicial relief.  ShipCycle satisfies both the heightened, post-award standard and, necessarily, the pre-award standard.

7.      Here, there is no question that ShipCycle is an "interested party" with standing under the Tucker Act because it is an actual bidder, and, but for the Navy's errors discussed, *infra*, ShipCycle would have remained in the competition, continued to pursue award, and stood a

2

substantial likelihood of receiving award.  As discussed below, EnergySolutions has derivative standing to bring this protest on ShipCycle's behalf.

### Derivative Standing and Compliance with RCFC 23.1

8.      RCFC 23.1 permits shareholders or members of an unincorporated association to bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce.[1]  Likewise, the Federal Circuit held that, under certain circumstances, the Court of Federal Claims has Tucker Act jurisdiction to hear derivative actions without "extend[ing] the jurisdiction of the Court of Federal Claims to a class of claims not previously within its jurisdiction."  *First Hartford Corp. Pension Plan & Tr. v. United States*, 194 F.3d 1279, 1293 (Fed. Cir. 1999).[2]  Instead, derivative suits merely "permit[] shareholders to step into the shoes of the corporation and file suit as fiduciaries on the corporation behalf and for the corporation's benefit."  *Id.* (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 549 (1949)).

9.      To bring a derivative action under Rule 23.1 the complaint must allege that (1) "the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law"; (2) "the action is not a collusive one to confer jurisdiction that the court would otherwise lack"; and (3) state with particularity "any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members" and "the reasons for

---

[1] As mentioned earlier, ShipCycle is a Delaware limited liability company.  Delaware law governs ShipCycle's internal affairs, and it permits derivative suits by LLC members.  *Clifford Paper, Inc. v. WPP Invs., LLC*, 2021 WL 2211694, at *6 (Del. Ch. 2021) ("[C]ase law governing corporate derivative suits is equally applicable to suits on behalf of an LLC") (quoting *VGS, Inc. v. Castiel*, 2003 WL 723285, at *11 (Del. Ch. Feb. 28, 2003)).

[2] *First Hartford* predates RCFC 23.1, which was adopted in 2002 in response to that decision. *See* RCFC 21.3, Rule Committee Notes to 2002 Adoption.

not obtaining the action or not making the effort." RCFC 23.1(b). All of these elements are met here.

10.     Discussed above, EnergySolutions is one of ShipCycle's two members. ShipCycle was formed with the express purpose of bidding on the Solicitation, and EnergySolutions has a ▮▮▮▮ interest in ShipCycle, which it has owned since before ShipCycle's bid was submitted. Thus, EnergySolutions has satisfied the first derivative requirement.

11.     Second, EnergySolutions is not bringing this protest to confer jurisdiction the Court would otherwise lack. Rather, EnergySolutions believes ShipCycle has a good faith protest and seeks a decision on those arguments. This satisfies the second element for derivative standing.

12.     Finally, Mr. Morrison's declaration in Appendix A speaks to EnergySolutions' efforts to persuade ShipCycle's majority member to bring this protest in ShipCycle's name. We adopt and incorporate Mr. Morrison's testimony by this reference, but summarize it here for the Court's ready reference:

> EnergySolutions believed, and still believes, that the Navy's decision [to reject ShipCycle's proposal as late] was unreasonable and irrational. The EnergySolutions Board members persuaded the Huntington Ingalls board members to join us and approve a protest of the Navy's decision; however, they were only willing to authorize ShipCycle to file an agency-level protest with the Navy in the hope the Navy would not be antagonized and would find a way to consider the ▮▮▮▮▮▮▮▮ our proposal offered versus its decision to eliminate that offer from consideration. [Mr. Morrison] understood that an agency-level protest was less aggressive than protesting at Government Accountability Office or the U.S. Court of Federal Claims Court, so Huntington Ingalls was willing to proceed. (App'x A, ¶ 10).

> On June 9, ShipCycle filed an agency protest with the Navy through Huntington Ingalls' long-time counsel. The Navy denied that protest on July 8, 2025. (App'x A, ¶ 11).

> Since that time, [Mr. Morrison has] had many discussions with ▮▮▮▮▮▮▮▮, who is ShipCycle's chairman and president of HII

Nuclear Inc.'s Global Security Group. During those discussions, [Mr. Morrison] [] urged ████████ and the Huntington Ingalls team to pursue ShipCycle's protest to the U.S. Court of Federal Claims. (App'x A, ¶ 12.)

On July 11, ShipCycle's Board met and discussed the potential protest, but did not put the issue to a vote or take any formal action. All Board members conceded that if a protest went forward, the Court presented the most viable action. But the Huntington Ingalls representatives were not yet ready to act, though they promised to appeal to Huntington Ingall's corporate leadership to authorize a Court of Federal Claims protest. (App'x A, ¶ 13.)

On or about August 4, [Mr. Morrison] talked with ████████ privately. [Mr. Morrison] impressed upon him that Energy*Solutions* thought it was in ShipCycle's best interest to pursue the protest at Court. [Mr. Morrison] even offered to use [Energy*Solutions*'] lawyers with Maynard Nexsen at EnergySolutions' sole cost. Given that the Enterprise decommissioning effort was ShipCycle's only focus, and the lack of any cost risk to ShipCycle or Huntington Ingalls, Energy*Solutions* felt there was no reason to oppose the protest. (App'x A, ¶ 14.)

But during the August 4 call, ████████ told [Mr. Morrison] unequivocally that neither he nor the other ShipCycle Board member from Huntington Ingalls, ████████, would vote in favor of pursuing the protest at Court. As [Mr. Morrison] understood ████████ comments, he had socialized the protest inside Huntington Ingalls and was instructed they would never authorize nor support progressing the protest beyond the agency level (which was denied). As [Mr. Morrison] understood it, this was because of Huntington Ingalls' larger relationship with the Navy and its belief that taking no further action was in Huntington Ingalls' best interest. Based on ████████ comments to [Mr. Morrison], EnergySolutions concluded it would be futile to call for a ShipCycle Board vote or otherwise continue trying to persuade Huntington Ingalls to support further protest efforts. (App'x A, ¶ 15.)

13.    As Mr. Morrison's testimony conclusively shows, EnergySolutions did all it could to persuade Huntington Ingalls and ShipCycle's majority owner to proceed with this protest. But ShipCycle's chairman, a Huntington Ingalls executive, confirmed that would never happen. So further demand or action by ShipCycle would have been futile.

14.    Because EnergySolutions has met the Rule 23.1(b)'s pleading requirements, it has

standing to "step into the shoes of" ShipCycle and bring this protest on ShipCycle's behalf.

### The Applicable Pleading Standard

15.    The *Twombly* / *Iqbal* pleading standard applies at the U.S. Court of Federal Claims.

*See Vanquish Worldwide, LLC v. United States*, 147 Fed. Cl. 390, 399 (2020).  However, as Judge

Kaplan noted in that decision, "a party need only plead 'facts to state a claim to relief that is

plausible on its face,' with facts sufficient to nudge 'claims across the line from conceivable to

plausible.'"  *Id.* (quoting *TrinCo Inv. Co. v. United States*, 722 F.3d 1375, 1380 (Fed. Cir. 2013)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))).  Further, under *Iqbal*, "[a] claim

is plausible on its face when 'the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id.* (quoting *Ashcroft

v. Iqbal*, 556 U.S. 662, 678 (2009)).

16.    The *Vanquish* decision involved appeals under the Contract Disputes Act.  *See id.*

at 398.  The government moved to dismiss the plaintiff's complaint for failure to state a claim,

alleging that its breach claims were based on "mere 'suspicions,'" that did not meet the pleading

standards under *Twombly* and Rule 8, RCFC.  *Id.* at 401.  Judge Kaplan disagreed and wrote:

> Fairly read, Vanquish's complaint alleges as a matter of fact that
> USTRANSCOM did not follow the OML process and that, had it
> been followed, Vanquish would have been assigned more missions
> than in fact it was assigned.  ***To be sure, Vanquish makes this
> allegation "on information and belief."***  But that does not preclude
> it from meeting the *Twombly* plausibility standard, as the
> government contends. *See Arista Records, LLC v. Doe 3*, 604 F.3d
> 110, 120 (2d Cir. 2010) (observing that "[t]he Twombly plausibility
> standard ... does not prevent a plaintiff from 'pleading facts alleged
> on information and belief' where the facts are peculiarly within the
> possession and control of the defendant, or where the belief is based
> on factual information that makes the inference of culpability
> plausible"); 5 Arthur R. Miller *et al.*, *Federal Practice and
> Procedure* § 1224 (3d ed. 1998) ("Although there is no express
> authorization in the federal rules for pleading on information and

> belief, allegations in this form have been held to be permissible, even after the Twombly and Iqbal decisions."); *see also Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1330 (Fed. Cir. 2009) (reasoning that a plaintiff is permitted to make allegations based on information and belief even under heightened pleading standards, such as those established for fraud under Fed. R. Civ. P. 9(b), "when essential information lies uniquely within another party's control," at least "if the pleading sets forth the specific facts upon which the belief is reasonably based").

*Id.* (emphasis added). As Judge Kaplan noted, the Federal Circuit has approved of "information and belief" allegations "'when essential information lies uniquely within another party's control,' at least 'if the pleading sets forth the specific facts upon which the belief is reasonably based.'" *Id.* (quoting *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1330 (Fed. Cir. 2009)); *see also Innova Hosp. San Antonio, LP v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 730-31 (5th Cir. 2018) ("[W]hile a plaintiff must offer sufficient factual allegations to show that he or she is not merely engaged in a fishing expedition or strike suit, we must also take account of his or her limited access to crucial information. This is because if plaintiffs cannot state a claim without pleading facts which tend systemically to be in the sole possession of defendants, the remedial scheme of the statute will fail, and the crucial rights secured by ERISA will suffer." (citations and internal quotation marks omitted)); *City of Evanston v. N. Ill. Gas Co.*, 229 F. Supp. 3d 714, 721 (N.D. Ill. 2017) ("Pleading on information and belief is a 'practical necessity' that is 'desirable and essential [ ] when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the subject.'"); *Gonzalez v. Cnty. of Merced*, No. 116CV01682LJOSAB, 2017 WL 2345681, at *7 (E.D. Cal. May 30, 2017), report and recommendation adopted, No. 1:16-CV-1682-LJO-SAB, 2017 WL 2812928 (E.D. Cal. June 29, 2017) ("Pleading on information and belief is a desirable and essential expedient when matters that are necessary to complete the

statement of a claim are not within the knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the subject." (internal quotation marks omitted)).

17.    The Navy removed ShipCycle from consideration after it unreasonably determined that ShipCycle's proposal was late.  Discussed below, a malfunction of the Procurement Integrated Enterprise Environment ("PIEE") website's Solicitation Module ("PIEE Solicitation Module") designated for the receipt of proposals prevented ShipCycle from completing the electronic signature and submission process for its Final Proposal Revision ("FPR").  Information about the PIEE website and the rejection of ShipCycle's proposal is absolutely "essential information [that] lies uniquely within" the Government's control.  Accordingly, ShipCycle bases its allegations below on its own knowledge and, where appropriate, on information and belief.  Under the applicable pleading standard, ShipCycle's allegations are more than sufficient to state a claim. *Exergen Corp.*, 575 F.3d at 1330.

## BACKGROUND

18.    The USS Enterprise (CVN 65) was the Navy's first nuclear-powered aircraft carrier. Commissioned in 1961, the USS Enterprise played a central role in U.S. naval operations spanning the Cold War, Vietnam War, and post-9/11 conflicts, including Operations Enduring Freedom and Iraqi Freedom.  In 2017, after more than 50 years of operations, the USS Enterprise was officially decommissioned by the Navy.

19.    The USS Enterprise contained a number of reactor and propulsion plants. As part of the decommissioning process, the Navy removed the fuel from the aircraft carrier, rendering the USS Enterprise obsolete.  Currently, the USS Enterprise sits pier-side at Huntington Ingalls Industries Newport News Shipbuilding in Newport News, Virginia.  The Solicitation sought support in completely dismantling and disposing of the USS Enterprise.

**The Solicitation's Requirements**

20.     Prospective offerors were instructed to submit a proposal detailing their approach to each of the Solicitation's requirements.  The Solicitation told offerors to submit their proposals in four volumes:  Volume I – Standard Form 33 Solicitation Set/Model Contract; Volume II – Technical Proposal; Volume III – Price Proposal; and Volume IV – Past Performance. Offerors were also instructed to include a "forwarding letter" that (1) stated the proposal was for all requirements stated in the Solicitation, (2) was made without qualification or exception to any terms and conditions, and (3) could include an executive summary of the Technical and Price proposals.

21.     When it came time to evaluate proposals, the Navy said it would look at three factors:  Factor 1–Technical/Management Approach; Factor 2–Past Performance; and Factor 3– Total Evaluated Price.  The Navy said it would evaluate Factor 1 on an Acceptable/Unacceptable basis. Factor 2 would be evaluated using adjectival ratings ranging from Substantial Confidence to No Confidence.  Finally, Factor 3 would be evaluated for reasonableness.  Award was to be made to the "responsible Offeror whose proposal represent[ed] the best value to the Government."

22.     Although the Solicitation did not originally contemplate discussions, following protests ShipCycle filed with the Navy and, eventually, GAO, the Navy committed to hold discussions.

**Initial Proposal Submission, Revised Proposal Submission, and Award**

23.     The Solicitation required offerors to submit their proposals through the PIEE Solicitation Module, "the only acceptable method of submission."  The Navy said it would not accept hard copy or emailed proposals.  Importantly, although the Solicitation warned offerors that they should create and register a PIEE account early, the Solicitation did not include any special

instructions or identify any special technical requirement for uploading proposal onto the PIEE Solicitation Module.

24.     On January 5, 2025, ShipCycle uploaded its initial proposal to the PIEE Solicitation Module.  The entire process took less than ten minutes.  (App'x B, p. B-18).  The PIEE Solicitation Module accepted all of ShipCycle's initial proposal documents.

25.     On April 2, 2025, the Navy opened discussions.  The Contracting Officer provided a list of questions or evaluation notices, tailored to each offeror's proposal and noted all findings of risk.  On April 16, 2025, the Contracting Officer issued letters to three offerors in the competitive range—including ShipCycle—closing discussions and requesting FPR by April 23, 2025, at 3:00 p.m. local time.

26.     At 1:30 p.m. local time on April 23, 2025, ███████████ from Huntington Ingalls began his first attempt at uploading ShipCycle's FPR to the PIEE Solicitation Module, using the same method employed to successfully upload its initial proposal.  Shortly after ███ ██████ began uploading ShipCycle's FPR, he realized the PIEE website was not functioning correctly.  The website appeared to be frozen and the indicator was spinning.  This prevented ███ ██████ from uploading any of ShipCycle's proposal files.  (App'x B, p. B-23).

27.     At 1:45 p.m., ██████████ terminated his first attempt to upload ShipCycle's FPR.  (App'x B, p. B-23).

28.     At 1:48 p.m., ██████████ began his second attempt at uploading the FPR to the PIEE website.  This time, he was able to successfully upload seven PDF files.[3]  (App'x B, p. B-23).

---

[3] ShipCycle's FPR consisted of forty-seven documents total: ████████████████████████
████████████████████████.

██████████████████████████████████
██████████████████████████████████

29.    At 1:51 p.m., ███████████ received a submission confirmation, showing that the first seven files (the smallest) had been successfully uploaded.  (App'x B, p. B-23).

30.    At 1:51 p.m., ███████████ attempted to upload the remaining forty FPR files to the PIEE website in small batches.  Shortly thereafter, at 1:55 PM, the PIEE website froze and displayed a "Please Wait" message. ███████████ took a screenshot of this message.  (*See* App'x B, p. B-24).

31.    At 2:07 p.m., the PIEE website displayed a message saying the session would expire in five minutes and asked whether it should be extended.  However, due to the "Please Wait" message mentioned above, the option to extend the session was not accessible. ██ ███████ took a screenshot of this error as well.  (App'x B, p. B-24).

32.    At 2:14 p.m., ███████████ notified the Contracting Officer of the problems he was encountering, writing "[w]e are having difficulty saving our FPR files to PIEE.  Do you know of any issues with the system?"  (App'x C, agency-level protest decision, p. C-2).[4]

33.    At 2:18 p.m., the Contracting Officer replied, "Just logging in now I had some issues with the landing page of the Solicitation module, but they were cleared up when I refreshed the page.[5]  Is there a specific error message you are receiving?"[6]  (*See* App'x C, p. C-2).

---

[4] These facts come from the protest decision issued by the Navy's Director of Contracts, made in her official capacity, within the line and scope of her employment deciding ShipCycle's agency protest.  Thus, these are admissions by a party opponent.  *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 91 Fed. Cl. 347, 359 (2010), *amended on reconsideration in part*, 98 Fed. Cl. 45 (2011) (auditors' statements in workpapers made while working with the Inspector General to review a procurement were "admissions by party-opponent—not hearsay[]" under Rule 801(d)(2)(D)).

[5] Upon information and belief, the Contracting Officer did not attempt to upload any documents to the PIEE website.

[6] At 2:45 PM, ███████████ sent a screenshot of an error message that stated "[y]our connection was interrupted[.]  A network change was detected.  ERR_NETWORK_CHANGED[.]"  (*See* App'x C, p. C-2).

34.     Between 2:18 p.m. and 2:26 p.m., ███████████ attempted to upload the remaining forty files.  Although he was able to load the files onto the website, he was unable to save them or sign so that they could be submitted.  (App'x C, p. C-2).

35.     At 2:27 p.m., ████████████ sent the Contracting Officer a message, stating: "I am trying to save each file individually now but it is really slow.  I don't see how the changes will be saved by 3pm and need an extension."  (App'x C, p. C-2).

36.     By 2:51 p.m., although another ShipCycle employee succeeded in *uploading* its entire FPR, ShipCycle had only been able to *submit* Volume I of its proposal.  A 2:52 p.m. PIEE notification to the Contracting Officer confirmed that ████████████ made a submission for ShipCycle.  (App'x C, p. C-2).

37.     At 2:55 p.m., ████████████ received an error that said, "Offer identifier already exists for the selected CAGE, please enter a unique value."  (App'x B, p. B-25).

38.     At 2:57 p.m., ████████████ called the Contracting Officer and informed him the offer submitted was not complete and only contained Volume I at that time.  The Contracting Officer confirmed receipt of the 2:52 PM submission.  (App'x C, p. C-2).

39.     At 3:06 p.m., ████████████ again called the Contracting Officer to describe a specific error saying, "offer identified already exists for the selected CAGE code."  (App'x C, p. C-2).

40.     At 3:32 p.m., the Contracting Officer called ████████████ to confirm receipt of the partial submission.  The Contracting Officer also said the system should allow for late submissions, but the Navy had not determined whether it would accept ShipCycle's proposal.  (App'x C, p. C-2).  The Contracting Officer encouraged ShipCycle to continue trying to upload the proposal to the PIEE website. (App'x B, p. B-23).

41.     Between 3:33 p.m. and 9:40 p.m., ███████████ and ShipCycle personnel continued trying to upload the remaining files.  During this time, ShipCycle attempted to access the Navy's system from multiple networks and continued to encounter the same problems, *i.e.*, an inability to sign and submit files and a "Please Wait" message leading to the PIEE website timing out.  (App'x B, p. B-19).

42.     "At 4:47 p.m., ███████████ emailed the Contracting Officer describing continued difficulty and requesting he reopen the solicitation, suggesting that the issue may be due to the fact that the [S]olicitation was closed in PIEE."  (App'x C, p. C-2).

43.     "At 5:06 p.m., the Contracting Officer responded stating, 'I'm not able to see what you see on your end but you should be able to submit an offer even though the [S]olicitation is closed.'"  (App'x C, p. C-2).

44.     "At 5:23 p.m., ███████████ emailed the Contracting Officer: '[w]e are unable to submit in PIEE.  We are willing to bring a thumb drive if you can accept it.  We need an extension due to problems we are having with the Government system.  We will continue to attempt a file load this evening.  Is there any other format we can provide other than through PIEE?  Where can we bring the thumb drive tonight or first thing in the morning?'"  (App'x C, p. C-2).

45.     "At 5:33 p.m., ███████████ left a voicemail with the Contracting Officer describing ShipCycle's difficulties, stating that it had informed its CEO of the issues and restating the offer to deliver a thumb drive."  (App'x C, p. C-2).

46.     "At 6:26 p.m., ███████████ attempted to email the Contracting Officer the FPR 'piece meal.'  Only one email was submitted, and it included the same attachments that were already received in ShipCycle's 2:52 pm partial submission through PIEE. ███████████ email stated:  'I was still unable to get our FPR uploaded due to issues with the Government PIEE system.

Depending on the file size limits on your end, I am emailing the files directly to you piece meal. Please acknowledge receipt as I send them.'" (App'x C, p. C-2).

47.    "At 7:12 p.m., the Contracting Officer emailed ████████ and stated, '[p]er Section L.3 of the solicitation, '[h]and-carried and mail delivered proposals will not be accepted. Submission of e-mail offers is not authorized for this [S]olicitation, except for proprietary subcontractor submissions, as indicated below.  The PIEE website is the only acceptable method of submission.'  At this time, the Government cannot commit to how it would treat a late proposal submission.'" (App'x C, pp. C-2 to C-3).

48.    "At 7:43 p.m., ████████ emailed a screenshot showing the error message he received when trying to add a signature to the offer:  'Offer identifier already exists for the selected CAGE, please enter a unique value.'" (App'x C, p. C-3).

49.    "At 8:55 p.m., ████████ emailed the Contracting Officer two MS Project Exchange attachments (.mmpx and .mpx)." (App'x C, p. C-).

50.    "At 10:10 p.m., ████████ emailed the Contracting Officer ShipCycle's account of the timeline and statement of facts." (App'x C, p. C-3).

51.    "At 10:42 p.m., the Contracting Officer received a PIEE notification via email that an offer was submitted late by ████████ for ShipCycle." (App'x C, p. C-3).

52.    "At 11:39 p.m., the Contracting Officer received a PIEE notification via email that an offer was submitted late by ████████ for ShipCycle." (App'x C, p. C-3).

14

53.     In all, it took ShipCycle eight hours and eleven minutes to submit its FPR—in contrast to the less than ten minutes (two minutes for file loading) it took ShipCycle to submit its Initial Proposal.[7]

<strong><u>ShipCycle's Exclusion, Award, and Agency Level Protest</u></strong>

54.     On May 30, 2025, the Navy told ShipCycle it "has been eliminated from the competition for solicitation N00024-24-R-4135 (the Solicitation) as its proposal was late."  The Navy apparently awarded to NorthStar Maritime Dismantlement Services, LLC the same day, before ShipCycle could file a pre-award protest.

55.     On June 9, 2025, ShipCycle filed its agency level protest arguing, among other things, that the Navy's refusal to accept and evaluate ShipCycle's FPR was arbitrary and unreasonable.  That same day, the Navy provided ShipCycle with a debriefing saying "[a]fter investigation of the facts regarding ShipCycle's untimely FPR submission, the Contracting Officer eliminated ShipCycle from the competition."

56.     On July 8, 2025, the Navy denied ShipCycle's agency protest, finding that none of the FAR's exceptions to the "Late-Is-Late" rule applied.  The Navy did not otherwise consider whether it should have waived any of the submission requirements.

57.     This protest follows.

<strong><u>COUNT I</u></strong>
<strong>(THE AGENCY UNREASONABLY ABUSED ITS DISCRETION BY REFUSING TO GRANT OR EVEN CONSIDER SHIPCYCLE'S REASONABLE AND TIMELY PRE-DEADLINE REQUEST FOR AN EXTENSION)</strong>

58.     EnergySolutions, derivatively for ShipCycle, incorporates the preceding paragraphs as if set forth fully herein.

---

[7] Although it is true the FPR included a larger number of files and a larger aggregate file size than the initial proposal, ShipCycle's submission was under the maximum file size permitted by the PIEE website.

59.     The Court can resolve this protest in ShipCycle's favor without having to decide whether ShipCycle's proposal submission satisfied the Government Control Exception of the Late-Is-Late rule or whether the Government bears responsibility for any failure to complete a timely submission.  That is because, before the proposal submission deadline had passed, ShipCycle advised the Contracting Officer in writing of submission problems with the Government's PIEE system and reasonably requested that the Contracting Officer extend the proposal deadline for a brief period.  The Contracting Officer had no basis—rational or otherwise—not to grant ShipCycle's requested brief extension of the deadline for submitting FPRs.  Under the specific facts of this case, that was arbitrary and capricious and an abuse of discretion, depriving ShipCycle of an almost certain contract award and █████████████████████████████████

██████████████

60.     ShipCycle's proposal team was familiar with the PIEE system and had successfully completed similar submissions in less than ten minutes.  Thus, when it came time to submit its FPR, ShipCycle allowed a more than reasonable hour and a half for submission.  When the Government's PIEE website repeatedly prevented ShipCycle from completing the submission process for its FPR, ShipCycle promptly informed the Contracting Officer of the issue.  The Contracting Officer acknowledged that he, too, had experienced something unusual with PIEE that day, but it had been resolved (although the Contracting Officer obviously did not attempt to upload a proposal).  ShipCycle unsuccessfully continued to try to complete the PIEE submission process.

61.     At 2:27 p.m., more than half an hour before the 3:00 p.m. submission deadline, ShipCycle wrote to the Contracting Officer, reasonably asking for an extension of the common deadline given the difficulties it was experiencing.  The Navy did not grant this reasonable request.

62.     ShipCycle's written expression of dissatisfaction and request for relief put the Agency on notice of a serious issue with the procurement (regardless of which, if any, party was responsible for the issue).  This communication constituted a timely pre-award agency-level protest. *See Coulson Aviation (USA), Inc.*, B-411525 *et al.*, 2015 CPD ¶ 272, 2015 WL 5157336, at *5  (Comp. Gen. Aug. 14, 2015) (a written statement to an agency constitutes an agency-level protest when it includes "a specific expression of dissatisfaction with the agency's actions and a request for relief"); *see also SEKRI, Inc. v. United States*, 34 F.4th 1063, 1068 (Fed. Cir. 2022) (pre-award email exchange with the agency raising concerns with procurement process and compliance with mandatory source requirements preserved the pre-award argument for a subsequent post-award protest); *Harmonia Holdings Grp., LLC v. United States*, 20 F.4th 759, 767 (Fed. Cir. 2021) (offeror preserved its pre-award challenge to the terms of the solicitation by providing notice to the agency of its concerns in a pre-award agency-level protest).

63.     Although contracting officers have broad discretion with respect to setting proposal submission deadlines and granting or denying timely requests to extend them, that discretion is not absolute.  In *MCR Federal, LLC*, for example, the GAO sustained a protest where an offeror reasonably requested an extension of the deadline for submitting revised proposals and the procuring agency failed to articulate a rational basis for not accommodating the request.  *MCR Fed., LLC*, B-416654.2 *et al.*, 2019 CPD ¶ 335, 2018 WL 9877998, at *6 (Comp. Gen. Dec. 18, 2018).  Considering the facts before it, the GAO found that the agency's refusal to extend the deadline was not reasonably calculated "to maximize the agency's ability to obtain the best value." *Id.*  The GAO also rejected the agency's contention that even a brief extension was not reasonably possible given the urgency of requirements, where the record failed to establish that the requested extension would have created a substantial delay.  *Id.* at 7 n.7.

64.     Here, when ShipCycle requested a brief extension to the upcoming submission deadline, there were overwhelmingly compelling reasons to grant the request. The Contracting Officer knew there were only three offerors for this significant work. He also knew that, as of the evaluation of initial proposals, ShipCycle's past performance (the only non-price factor evaluated on an other than pass/fail basis) ███████████████████████████████████████ ██████████████████████████████████. And, perhaps most significantly, he knew that ███████████████████████████████████████████. Thus, there were substantial reasons to grant ShipCycle's request for a brief extension of the deadline to submit proposal revisions. These compelling reasons were in addition to the fact that a contractor experienced with PIEE was having repeated, unexplained problems in completing a PIEE submission process that, in the contractor's experience, ordinarily takes less than ten minutes to finish.

65.     Thus, under the specific facts of this case, there were numerous weighty, documented reasons for granting ShipCycle's reasonable and timely request for an extension. There was no documented reason (whether rational or otherwise) for denying it. The Agency's failure even to consider the request was arbitrary and capricious and an abuse of discretion.

66.     If the request had been granted, ShipCycle's revised proposal almost certainly would have been selected for award: ████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████████. This easily satisfies the "non-trivial competitive injury" that ShipCycle is required to show for prejudice

under this pre-award protest ground.  It also would satisfy the more stringent "substantial chance" test applicable to post-award protest grounds.

## COUNT II
### (THE AGENCY UNREASONABLY DETERMINED THAT SHIPCYCLE'S SUBMISSION DID NOT QUALIFY FOR THE GOVERNMENT CONTROL EXCEPTION)

67.    EnergySolutions, derivatively for ShipCycle, incorporates the preceding paragraphs as if set forth fully herein.

68.    The Navy's decision not to accept ShipCycle's proposal was unreasonable because ShipCycle successfully uploaded its FPR to the Government's website prior to the deadline for submission.  Under the Government Control Exception to the "Late-Is-Late" rule, any proposal received after the deadline is "late" and will not be considered unless it is received before award is made,[8] the contracting officer determines that accepting the late offer will not unduly delay the acquisition, and "[t]here is acceptable evidence to establish that it was received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers."  FAR 52.215-1(c)(3)(ii)(A)(2).

69.    For purposes of the Government Control Exception, a "Government installation" is the government entry point specified in a solicitation for receipt of proposals.  *See Fed. Acquisition Servs. Team, LLC v. United States*, 124 Fed. Cl. 690, 704 (2016) ("when an e-mailed proposal is received by the first server designated by the government to receive e-mails directed to the address contained in a solicitation, it has been 'received at the Government installation designated for

---

[8] The Navy may insist that the Government Control Exception does not apply because the Navy never "received" ShipCycle's FPR, but this is a problem of the Agency's own making.  The Solicitation required offerors to submit their proposals to the Government's PIEE website.  That website—not the Navy—was the Government installation designated for "receipt."  Once the deadline for submission passed, the Navy had to retrieve ShipCycle's proposal from PIEE.  Therefore, the fact that the Navy did not "receive" ShipCycle's FPR before an award was made should not be held against ShipCycle.

receipt of offers' for purposes of the exception") (quoting FAR 52.215-1(c)(3)(ii)(A)(2)); *Insight Sys. Corp. v. United States*, 110 Fed. Cl. 564, 578 (2013) ("[M]uch like a mail room or other depository in a building, to which paper proposals can be delivered—a server controlled by the government most certainly can be an 'installation' that receives electronic submissions."); *Elec. On-Ramp, Inc. v. United States*, 104 Fed. Cl. 151, 162 (2012) ("a proposal can be received at the government installation when an offeror's courier logs in with a security guard or front desk and proffers the proposal for delivery"). In *Insight Systems Corp.*, the Court found that the proposals were "received" by a government installation for purposes of the Government Control Exception when the initial server "took" the electronic messages submitted by plaintiffs. 110 Fed. Cl. at 577.

70.    The FAR provides several examples of "acceptable evidence" establishing that a proposal was received at the Government installation, including "the time/date stamp of that installation on the proposal wrapper." FAR 15.208(c).

71.    This Court has interpreted "Government control" in this context as occurring when "the offeror relinquishes control over the proposal such that the offeror no longer can modify the proposal." *Elec. On-Ramp, Inc. v. United States*, 104 Fed. Cl. 151, 163 (2012).

72.    This Court has repeatedly held that electronic submissions, such as ShipCycle's FPR, qualify for the Government Control Exception.[9] *See eSimplicity, Inc. v. United States*, 162 Fed. Cl. 372 (2022) (holding Government Control Exception applies to electronic submissions); *Insight Sys. Corp. v. United States*, 110 Fed. Cl. 564, 581 (2013) ("in the case of an electronic

---

[9] The GAO has consistently held the opposite. *See, e.g.*, *ICS Nett, Inc.*, B-422575, 2024 CPD ¶ 168, 2024 WL 3537521, at *5 (Comp. Gen. July 24, 2024) ("As we have addressed in previous decisions, the government control exception does not apply to electronic submissions."). In contrast, the Court has only sided with the GAO once, over two decades ago, in *Conscoop-Consorzia Fra Cooperative Di Prod. E Lavoro v. United States*, 62 Fed. Cl. 219, 239-40 (2004) (agreeing with GAO's rationale but also holding that even if the exception applied, protester's proposal did not arrive prior to the deadline).

delivery, the Government Control exception applies where the electronic proposal is received by a government server (or comparable computer) and is under the agency's control prior to the deadline"). The Court has observed, "[i]t is particularly appropriate that the 'Government Control' exception be available to offerors where there is 'acceptable evidence' to establish that the offeror's e-mail proposal 'was received at the Government installation designated for receipt of offers and was under the Government's control prior to the time set for receipt of offers.'" *Watterson Constr. Co. v. United States*, 98 Fed. Cl. 84, 97 (2011) (an electronic proposal received by the government server on time was not late because it was received by and under the control of the government).

73.     In *Watterson Construction Co.*, the Court determined that "neither the text of [the FAR's Government Control exception] nor the regulatory history supports a construction that would require an offeror, after relinquishing control of an e-mail proposal, to be responsible for the risk of late delivery when technical problems arise after an e-mail proposal reaches the e-gateway to a designated Government office." *Id.* at 97. In that case, an e-mail containing a proposal was timely received by the Government's "e-mail gateway," but made it to the e-mail inbox thirty-five minutes later (and four minutes too late) because of an unexplained "mail storm" affecting the Army Corps' email servers. *Id.* at 87 & n. 4.

74.     Here, the Solicitation and the FPR submission instructions required offerors to submit proposals to the Government's PIEE website. ShipCycle successfully uploaded its FPR to the Government's PIEE Solicitation Module before the 3 p.m. deadline. Because accepting ShipCycle's "late" offer would not unduly delay the acquisition, and ShipCycle's FPR was uploaded to the "Government installation designated for receipt of offers" and was "under the Government's control" prior to the 3:00 p.m. deadline, the Government Control Exception applies.

75.     *First*, although the Agency considered the Government Control Exception, the Agency failed to recognize that ShipCycle provided proof that it had uploaded its FPR to the PIEE Solicitation Module prior to the 3 p.m. deadline.  The operative fact is not whether the FPR was under the *Navy's* control, but whether the FPR was within *the Government installation* designated for receipt of offers (the PIEE Solicitation Module) and under *Government* control.  *See Fed. Acquisition Servs. Team, LLC v. United States*, 124 Fed. Cl. 690, 704 (2016) ("when an e-mailed proposal *is received by the first server designated by the government* to receive e-mails directed to the address contained in a solicitation, it has been 'received at the Government installation designated for receipt of offers" for purposes of the exception) (emphasis added); *see also Insight Sys. Corp. v. United States,* 110 Fed. Cl. 564 (2013).  ShipCycle uploaded its FPR submission to the PIEE Solicitation Module prior to 3:00 p.m., as indicated by the timestamps for each of the documents ShipCycle uploaded.  Therefore, ShipCycle's FPR submission was received at the Government installation designated for receipt of offers before the deadline and qualifies for the Government Control Exception.

76.     Despite ShipCycle's meeting the requirements for the Government Control Exception, the Agency unreasonably excluded ShipCycle from the competition on the basis that "[t]here is no evidence that the complete ShipCycle FPR was under the Navy's control prior to the deadline."  But that is not the requirement; the exception requires that the proposal be received at the Government installation designated for receipt of offers (which, in this case, was PIEE) and was under the Government's control prior to the time set for receipt of offers.  This Court has previously recognized, "the FAR provision applies to proposals 'under the Government's control,' and is not limited to proposals 'under the procuring agency's control' or 'the contracting officer's control.'"  *Fed. Acquisition Servs. Team, LLC v. United States*, 124 Fed. Cl. 690, 704 (2016) (citing

48 C.F.R. § 52.215–1(c)(3)(ii)(A)(2)).  The Court further explained, "the proposal must, before the deadline, be 'received at the Government installation designated for receipt of offers,' rather than at 'the Government office designated in the solicitation.'"  *Id*.  The Agency has read an additional requirement into the exception by requiring that the proposal be under the Navy's control prior to the deadline.

77.    ***Second***, because ShipCycle's proposal was successfully uploaded to the PIEE Solicitation Module, the Government had control over ShipCycle's proposal.  *See Kropp Holdings, Inc. v. United States,* 176 Fed. Cl. 512, 537 (2025) (where solicitation required offerors to submit proposals to DLA email address, the awardee had to show "that DLA servers received [the] proposal before the deadline" to establish control); *Fed. Acquisition Servs. Team, LLC v. United States*, 124 Fed. Cl. 690 (2016) (the record demonstrated sufficient government control over the proposal because the DISA server received the proposal at 11:58, scanned it for viruses, and forwarded it to the procuring agency, even though it was bounced back).  Again, ShipCycle successfully uploaded its FPR to the Government's designated website prior to the deadline, and the Government can verify that ShipCycle has not altered those documents since that time.  Accordingly, the ShipCycle's FPR was under the Government's control and qualifies for the Government Control Exception.

78.    ***Third***, accepting ShipCycle's "late" proposal would not have unduly delayed the acquisition.  The Contracting Officer executed a memorandum excluding ShipCycle's proposal from the competition, but that document is riddled with inaccuracies.  Relevant here, the memorandum states, "upon consideration of the Navy's schedule requirements and investigation of the facts regarding ShipCycle's untimely FPR submission, the Contracting Officer determined that accepting ShipCycle's late FPR would unduly delay the acquisition."  The memorandum does

not provide any facts or rationale to support this undue delay concern, presumably because none exists. The work on the ship cannot commence for several more months because the location in Mobile Bay where the USS Enterprise will be anchored for dismantlement is currently blocked by an offshore rig.

79. Because that interference, which may or may not be navigable, must be removed before the Enterprise can occupy that space, there is plenty of time for the Navy to consider ShipCycle's proposal. Furthermore, the picture below, taken on or around Friday, August 8, shows that the location where the Enterprise (CVN 65) will be located is currently blocked:



**PROTECTED INFORMATION TO BE DISCLOSED ONLY IN ACCORDANCE WITH U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

Upon information and belief, this location will not be free for several more months. Thus, again, there is plenty of time for the Navy to consider ShipCycle's proposal.

80.     Indeed, the fact that performance cannot begin until later this year at the earliest is why this protest can be resolved without the need for a preliminary injunction. Accordingly, a brief extension of a day would not have unduly delayed the procurement. Therefore, the Government Control Exception applies to ShipCycle's proposal.

81.     Relying only on the documents retrieved by the Navy rather than the documents uploaded at the designated government installation—the Government's PIEE Solicitation Module—the Navy unreasonably determined that ShipCycle made an incomplete, untimely, and inexcusably late submission, and excluded ShipCycle from the competition.

82.     There is no rational basis for the Navy not to apply the Government Control Exception here. This error was prejudicial because, had it done so, there is a substantial likelihood the Navy would have awarded the contract to ShipCycle in light of its ███████████████ and a ███████████████████████████.

## COUNT III
### (THE AGENCY UNREASONABLY ELIMINATED SHIPCYCLE'S PROPOSAL WHEN SHIPCYCLE WAS NOT AT FAULT FOR THE TECHNICAL ISSUES PERVADING THE PIEE SOLICITATION MODULE)

83.     EnergySolutions, derivatively for ShipCycle, incorporates the preceding paragraphs as if set forth fully herein.

84.     Even if the Court were to find the Government Control Exception inapplicable, it was arbitrary and capricious for the Navy to disqualify ShipCycle's FPR because it was the Government's fault that ShipCycle could not electronically "sign" and complete the formal "submission" of its uploaded FPR prior to the deadline. Similar to a courier waiting to hand off a physical proposal within a designated Government location, ShipCycle was left waiting in PIEE's

virtual waiting room as ShipCycle attempted to complete the formal "submission" of its uploaded FPR prior to the submission deadline.

85.     As the Complaint explained, the Solicitation required submission through the PIEE website, but PIEE would not allow ShipCycle to finalize the "submission" process for its uploaded proposal prior to the 3 p.m. deadline.  In essence, the PIEE website served as an electronic guard shack, preventing ShipCycle from delivering its proposal in a timely fashion, just as the physical guard shack did in *Electronic On-Ramp*.  *Elec. On-Ramp, Inc. v. United States*, 104 Fed. Cl. 151 (2012)).   Several ShipCycle personnel tried to upload the FPR files from multiple systems and received the same "please wait" error, negating any argument this incident was isolated.

86.     Other judges of this Court have found that, in similar instances, it was improper for a procuring agency to exclude offers under the Late-is-Late rule.  *See Elec. On-Ramp, Inc. v. United States,* 104 Fed. Cl. 151 (2012).  In *Electronic On-Ramp*, the plaintiff's courier could not deliver its proposal because he was not permitted beyond the base's visitor center.  The Court found the agency's refusal to consider plaintiff's "late" proposal unreasonable, stating, "[a] late proposal may be considered if 'government misdirection or mishandling' was the 'paramount cause' of the delay and consideration of the proposal would not compromise the competitive process."  *Id*. at 163.

87.     The Court has recognized that "construing the [Late-is-Late rule] exceptions too narrowly, particularly where some government failure or breakdown is the evident cause of the lateness of a submission, introduces its own discomforting unfairness and arbitrariness into the Federal procurement process, with the potential of unduly limiting competition and giving certain offerors an undeserved advantage."  *Insight Sys. Corp. v. United States*, 110 Fed. Cl. 564, 575 (2013).

88.     Although the FAR does not discuss circumstances when the Government itself prevents a timely proposal submission, this Court has held that not accepting such a proposal is arbitrary, capricious, an abuse of discretion, and contrary to law. *See Lab'y Corp. of Am. v. United States*, 108 Fed. Cl. 549 (2013) (sustaining protest where government's designated website stopped receiving proposals one hour ahead of closing time).

89.     Here, ShipCycle suffered from the PIEE Solicitation Module's slow loading times and IT issues that prevented it from signing and submitting its uploaded proposal. Despite building a healthy lead time of 90 minutes to upload and submit the FPR, ShipCycle was unable to complete the process of formalizing the "submission" of the FPR documents it had successfully (though painstakingly) uploaded to the Government site prior to the submission deadline. Accordingly, the Agency should not have excluded ShipCycle from the competition.

90.     The CO's decision to exclude the proposal is based on incorrect information, which led him to conclude that IT issues with the Government's website did not prevent ShipCycle from submitting a timely proposal and to exclude ShipCycle's proposal from the competition.

91.     *First*, in recounting the "facts," the Contracting Officer described the steps he took to investigate the problems ShipCycle encountered in using the Government's PIEE website to submit its proposal. The Contracting Officer wrote: "On Thursday May, 22, 2025, ███████████ ███ of DLA, confirmed that 'there were NO system issues with PIEE Solicitation Module on April 23, 2025, and *many vendors* were able to submit their proposals for this specific solicitation on time.'" This is incorrect. Only two other vendors submitted proposals in response to this Solicitation—███████████████████ submitted its proposal on April 23, and NorthStar submitted its proposal on April 22.

27

92.     **Second**, the Contracting Officer noted that a DLA employee confirmed that, "███ ███████ logged in successfully to PIEE prior [to] and after the solicitation closing time. He did encounter locked account issue on April 23, 2023, he was logged in successfully after the solicitation closing time.'" Based in part on these logs and DLA's emailed statements, the Contracting Officer concluded that a technical malfunction on the Government's website did not prevent ShipCycle from submitting its proposal. DLA's explanation and logs are plainly incomplete, as ███████ was not the only HII employee attempting to submit ShipCycle's FPR in PIEE. As the record elsewhere shows, ████████ and ███████ were also working to submit the FPR on behalf of ShipCycle and encountered technical difficulties. The DLA's logs and responses to the Contracting Officer say nothing at all about these users or their own documented problems with PIEE on April 23. Therefore, the Contracting Officer's reliance on incomplete information was arbitrary and capricious.

93.     **Third**, the Government has admitted that it does not retain information about proposals that are uploaded to PIEE. When the Navy asked DISA whether there was a way to "pull records of a vendor submitting offers" in PIEE, DISA Service Management responded that it did not retain information "on submission of user or any user data" on the PIEE Solicitation Module. Agencies have an obligation to document sufficiently to allow for effective judicial review. *DigiFlight, Inc. v. United States*, 165 Fed. Cl. 588, 609 (2023). By failing to document what gets uploaded and submitted, when, and by whom, to the Government IT system, the Government is preventing effective judicial review, and the Government should bear the burden of that. *See Lab'y Corp. of Am. v. United States*, 108 Fed. Cl. 549, 561 (2012) (where government website constituted means for submitting proposals, "agency was required to preserve the data relating to the website."). Had the Government retained information on user uploads via PIEE,

the Agency would have seen that ShipCycle successfully uploaded its FPR before the 3:00 p.m. deadline.

**PRAYER FOR RELIEF**

WHEREFORE, EnergySolutions, derivatively on ShipCycle's behalf, requests that this Court:

(i)     Enter a preliminary injunction prohibiting the Navy from proceeding with performance pending the outcome of this protest;

(ii)    Declare that the Navy's decision to reject ShipCycle's proposal was arbitrary, irrational, and/or contrary to law;

(iii)   Permanently enjoin the Navy from proceeding with performance;

(iv)    Require the Navy either to grant the proposal submission extension that ShipCycle reasonably requested prior to that deadline or to evaluate ShipCycle's full FPR, as it existed as of the original deadline;

(v)     Award ShipCycle such other and further relief as this Court may deem just and proper, including, without limitation, bid and proposal costs.

Dated: September 26, 2025                    Respectfully submitted,

                                             By: _____
                                                 Damien C. Specht
                                                 Morrison & Foerster LLP
                                                 2100 L Street NW
                                                 Suite 900
                                                 Washington, DC 20037
                                                 Phone: (202) 887-1574
                                                 Facsimile: (202) 887-0763

*Of Counsel:*

James A. Tucker
Victoria Dalcourt Angle
Thomas Lee
2100 L Street NW
Suite 900
Washington, DC 20037
Morrison & Foerster LLP