## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### BID PROTEST

ENERGYSOLUTIONS FEDERAL
SUPPORT, LLC, DERIVATIVELY ON
BEHALF OF HII SHIPCYCLE, LLC,

    *Plaintiff*,

v.

THE UNITED STATES,

    *Defendant*,

and

NORTHSTAR MARITIME
DISMANTLEMENT SERVICES, LLC,

    *Defendant-Intervenor*.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 25-1336

Judge Philip S. Hadji

▮▮▮▮▮▮▮▮▮▮▮▮▮

---

**ENERGYSOLUTIONS FEDERAL SUPPORT, LLC, DERIVATIVELY ON BEHALF OF HII SHIPCYCLE, LLC'S REPLY AND RESPONSE TO DEFENDANT AND DEFENDANT-INTERVENOR'S CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND MOTIONS TO DISMISS**

Dated:  October 17, 2025

Damien C. Specht
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Email:  DSpecht@mofo.com
Telephone:  (202) 791-8585
Facsimile:  (202) 887-0763

*Attorney of Record for EnergySolutions*
*Federal Support, LLC*

Of Counsel:

James A. Tucker
Victoria Dalcourt Angle
Thomas Lee
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Email: JTucker@mofo.com
       VDalcourt@mofo.com
       TLee@mofo.com

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

ARGUMENT .............................................................................................................................. 2

   I.    SHIPCYCLE SUCCEEDS ON THE MERITS OF ITS PROTEST................................... 2

      A.   It Was an Abuse of Discretion for the Agency Not to Grant ShipCycle's Pre-Deadline Request to Extend the FPR Deadline.................................................................................. 2

      B.   The Navy's Decision to Eliminate ShipCycle from Consideration Is Unreasonable Because the Government Control Exception Applies. ........................................................... 8

          1.   The Record Demonstrates That ShipCycle's FPR Timely Arrived at the Government Installation Designated for Receipt of Offers. ................................................................... 9

          2.   The Record Demonstrates that ShipCycle's FPR Was Under the Government's Control. ......................................................................................................................... 14

          3.   The Agency's Decision Not to Apply the Government Control Exception Is Unsupported by the Record. ............................................................................................. 17

      C.   In the Alternative, the Navy Unreasonably Eliminated ShipCycle's FPR When ShipCycle Was Not at Fault for the Technical Issues Affecting the PIEE "Sign and Submit" Process on the Afternoon of the Deadline Day.................................................................... 18

   II.   THE MOTIONS TO DISMISS FAIL BECAUSE ENERGYSOLUTIONS HAS DERIVATIVE STANDING TO STEP INTO THE SHOES OF THE OFFEROR AND PROTEST ON ITS BEHALF............................................................................................. 19

      A.   EnergySolutions Has Derivative Standing to Step into ShipCycle's Shoes. ............... 20

      B.   EnergySolutions Satisfied Rule 23.1. ........................................................................ 23

   III.   A PERMANENT INJUNCTION IS WARRANTED. ................................................. 27

CONCLUSION AND PRAYER FOR RELIEF ........................................................................ 28

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*Ala. Aircraft Indus., Inc.-Birmingham v. United States,*
    586 F.3d 1372 (Fed. Cir. 2009) ......................................................................................18

*BCPeabody Construction Services, Inc. v. United States,*
    112 Fed. Cl. 502 (2013) ..................................................................................................7

*Crowley Gov't Servs., Inc. v. United States,*
    171 Fed. Cl. 453 (2024) ................................................................................................15

*Elec. On-Ramp, Inc. v. United States,*
    104 Fed. Cl. 151 (2012) ................................................................................................14

*Energy Eng'g & Consulting Servs., LLC,*
    B-407352, 2012 CPD ¶ 353, 2012 WL 6691536 (Comp. Gen. Dec. 21, 2012) .......................6

*Fed. Acquisition Servs. Team, LLC v. United States,*
    124 Fed. Cl. 690 (2016) ................................................................................................27

*First Hartford Corp. Pension Plan & Tr. v. United States,*
    194 F.3d 1279 (Fed. Cir. 1999) ..........................................................................21, 22, 24

*Geo-Seis Helicopters, Inc. v. United States,*
    77 Fed. Cl. 633 (2007) ....................................................................................................5

*Guardian Moving & Storage Co. v. United States,*
    122 Fed. Cl. 117 (2015) ...............................................................................................5, 6

*Johnson Controls Government System, LLC v. United States,*
    125 Fed. Cl. 289 (2016) ................................................................................................16

*Level 3 Communications, LLC v. United States,*
    129 Fed. Cl. 487 (2016) ..................................................................................................7

*MCR Fed., LLC,*
    B-416654.2 *et al.*, 2019 CPD ¶ 335, 2018 WL 9877998 (Comp. Gen. Dec. 18,
    2018) ...................................................................................................................6, 7

*Nat'l Disability Rights Network, Inc.,*
    B-413528, 2016 CPD ¶ 333,2016 WL 6809939 (Comp. Gen. Nov. 16, 2016) .......................5

*Naval Systems, Inc. v. United States,*
    153 Fed. Cl. 166 (2021) ...........................................................................................11, 12

*Percipient.ai, Inc. v. United States*,
  No. 2023-1970, 2025 WL 2472671 (Fed. Cir. Aug. 28, 2025) ...............................................20

*Suess v. United States*,
  33 Fed. Cl. 89 (1995) .................................................................................................21

*Syncon, LLC v. United States*,
  154 Fed. Cl. 442 (2021) ........................................................................................11, 13

*United Food and Commercial Workers Union and Participating Food Industry
  Employers Tri-State Pension Fund v. Zuckerberg*,
  262 A.3d 1034 (Del. 2021) ...............................................................................25, 26

*Zolon PCS II, LLC;Polaris Consulting Group, Inc.*,
  B-420745.2 *et al.*, 2023 CPD ¶ 227, 2023 WL 6460991 (Comp. Gen. Sept. 20, 2023)............6

**Regulations**

28 U.S.C. § 1491(b) ...............................................................................................20, 21

28 U.S.C. § 1491(b)(1) ..................................................................................................20

RCFC 23.1(b)(3) ......................................................................................19, 23, 24

**Other Authorities**

FAR 5.208(b)(1)(ii).........................................................................................................14

FAR 15.208(e) .......................................................................................................15, 16

## INTRODUCTION

Plaintiff EnergySolutions Federal Support, LLC, derivatively on behalf of HII ShipCycle, LLC ("ShipCycle") respectfully files its response in opposition to the motions to dismiss and cross-motions for judgment on the administrative record filed by Defendant the United States ("Government") and Defendant-Intervenor NorthStar Maritime Dismantlement Services, LLC ("NorthStar" or "Intervenor"). This is a case about the United States Department of the Navy's ("Navy" or "Agency") unexplained, and inexplicable, decision not to grant offerors a brief extension of the upcoming deadline for submission of final proposal revisions ("FPRs") when ShipCycle informed the Contracting Officer of technical issues outside ShipCycle's control that threatened to make its FPR submission late. There was no reason not to grant the request, and overwhelming reason to do so: the Navy had already evaluated ShipCycle's initial offer (one of only three under consideration) as providing ███████████ and representing *more than* ███ in savings over NorthStar's offer, and *more than* ███████████████████████ ███. Nothing in the record explains the Navy's failure to preserve these ███ savings for the benefit of the American taxpayer and the Navy, particularly in this time when the Government is zealously pursuing savings wherever it can reasonably find them. Under the particular facts of this case, the Agency abused its discretion when it denied the request for an extension

To the extent the Court finds it necessary to determine whether ShipCycle's FPR was received late, when measured against the unextended submission deadline, the record supports a finding that ShipCycle satisfied the Government Control Exception to the Late Is Late rule. Although the Government did not retain records of when ShipCycle's FPR was received by the Government's Procurement Integrated Enterprise Environment ("PIEE") computer system— the Government installation designated for receipt of proposals—ShipCycle itself made

screenshots that provide evidence that the FPR volumes made it onto the PIEE system by the submission deadline and were under the Government's control by that time. Thus, even though ShipCycle was unable to complete the electronic formalities of the PIEE process by 3:00 p.m. (or for hours thereafter), there is evidence the FPR was successfully uploaded to PIEE by that time and excused from the Late Is Late rule.

In the alternative, even if the Government Control Exception had not been met, there is sufficient evidence to show that problems with the Government's computer system caused ShipCycle's inability to do so. This provides an alternative basis for sustaining the protest.

Because ShipCycle's majority joint venture member declined to authorize this bid protest, ShipCycle's minority member filed this protest as a derivative action on behalf of the disappointed offeror. The Government and Intervenor argue a derivative plaintiff cannot be an interested party for determining statutory standing to file a bid protest, and also argue that the demand and pleading standards for derivative actions were separately not met. We demonstrate below, as the Amended Complaint showed, that this is not the case.

## ARGUMENT

### I.    SHIPCYCLE SUCCEEDS ON THE MERITS OF ITS PROTEST.

#### A.    It Was an Abuse of Discretion for the Agency Not to Grant ShipCycle's Pre-Deadline Request to Extend the FPR Deadline.

In our opening brief, we showed that ShipCycle encountered insurmountable obstacles in attempting to submit its FPR through the PIEE system by the 3:00 p.m. deadline. Despite reasonably leaving an hour and a half to accomplish a task it knew from experience should take no longer than ten minutes, ShipCycle's proposal team saw that the unforeseeable system problems would prevent it from completing the process by the deadline. ECF 42 at 23-24. ShipCycle reasonably requested the Contracting Officer extend the upcoming FPR submission deadline. *Id.*

at 24. We showed that, under GAO and Court precedents, this request was functionally an agency-level pre-award protest, which preserved ShipCycle's ability to raise this pre-award ground in this protest.[1] *Id.* at 24-25.

We showed that the Contracting Officer knew at the time that ShipCycle's initial offer received the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for the only non-price factor rated on a sliding-scale basis, and that ShipCycle's initial price was *more than* ▮▮▮▮▮ *lower* than one offer (the eventual awardee's) and *more than* ▮▮▮▮▮▮▮▮▮▮. From a best value perspective, there was overwhelming reason for the Contracting Officer to grant ShipCycle's modest pre-deadline request and allow all three offerors an additional day to submit (or resubmit) their FPRs. *Id.* at 27-28. We showed that the record does not document *any* Agency consideration (rational or otherwise) to this reasonable request. *Id.* at 28. Under the specific facts of this case, it was an abuse of discretion for the Contracting Officer not to grant ShipCycle's request. *Id.* at 28-31.

The Government and Intervenor disagree. But neither points to anything in the record documenting a rational basis—or any basis—for the Contracting Officer's choice not to extend the deadline at the time the extension was timely sought. Def.-Int.'s Cross-Motion for Judgment on the Administrative Record ("MJAR"), ECF 46 at 35-40[2]; Def.'s Cross-MJAR, ECF 47 at 47-42.

---

[1] Neither the Government nor Intervenor substantively engages with ShipCycle's argument that the pre-deadline request was functionally a pre-award protest, although Intervenor asserts that a pre-award protest does not "somehow bypass[] the Late-is-Late rule." ECF 46 at 43. The point of the pre-award protest was not to bypass the Late is Late rule but to avoid being deemed late in the first place by timely seeking to extend the common FPR deadline for good cause shown.

[2] All citations to ShipCycle's Motion for Judgment on the Administrative Record ("MJAR") and the Government's and NorthStar's MJARs refer to the page number generated by the CM/ECF system.

The lack of documented rationale does not keep the Government and Intervenor from speculating about the decision not to preserve ▮▮▮▮▮▮▮▮▮▮▮▮ savings for the American taxpayer. The Government's only reference to these savings occurs in a footnote, where it claims the Agency does not know if ShipCycle offered "meaningful savings over NorthStar" because the Agency did not evaluate *the FPR*. ECF 47 at 49 n.13.[3] The record, however, shows that the Agency was fully aware, as of the *initial evaluation* (which was the only evaluation that had occurred when ShipCycle sought an extension), that ShipCycle's proposed price was more than ▮▮▮▮▮ lower than NorthStar's. AR Tab 41 at 7856. We are in a time of belt-tightening, and the Government has terminated countless contracts and employees this year to achieve savings far less than ▮▮▮▮▮▮. It is not credible for the Government to claim here that ▮▮▮▮▮▮ may not be meaningful savings or that the Agency was unaware of the potential magnitude of savings when it received ShipCycle's pre-deadline request for relief.

The Government also asserts that "[s]ending a one-line email extending the deadline at the last minute" was impossible and a "cavalier[]" suggestion because it "would have violated the solicitation and unfairly prejudiced the offerors who timely submitted their FPRs." ECF 47 at 47-48 (internal quotation marks omitted). An email to the three offerors extending the upcoming deadline would not have violated any solicitation provision—which is clear from the Government's failure to identify any such provision. Nor would any offeror have been prejudiced by an extension provided to all offerors. It is improper for the Government to create, in the heat of litigation, new rationales that the Contracting Officer contemporaneously did not consider.

The Government also claims "a post-hoc solicitation amendment extending the submission deadline—which is effectively what Energy Solutions sought by waiting until minutes before the

---

[3] Intervenor does not address the ▮▮▮▮▮▮ savings even in a footnote.

deadline to request an extension—is barred by the precedent of this Court." *Id.* at 48 (citing *Geo-Seis Helicopters, Inc. v. United States*, 77 Fed. Cl. 633, 645 (2007)). ShipCycle's *ante hoc* request to extend the deadline was not a request for a *post hoc* extension, and nothing in the record supports the suggestion that this might have been the rationale for not granting the request when the request was made.[4] The Government is wrong that half an hour is insufficient time to send a one-line email. Nor is it true that a pre-deadline email to all offerors would have been invalid.

For these points, *Guardian Moving & Storage Co. v. United States*, 122 Fed. Cl. 117 (2015) is instructive. There, a protester submitted its FPR on the day it was due, but the eventual awardee submitted a timely request for an extension due to difficulties it alone was experiencing. 122 Fed. Cl. at 125. Twenty-seven minutes before the deadline, the contracting officer granted the request by emailing both offerors and informing them that the impending deadline had been extended. *Id.*[5] After the agency awarded the contract to the offeror that sought the extension, the other offeror protested. The Court rejected the protester's argument that the extension of the upcoming deadline was invalid because it was issued as an email instead of a formal amendment—which appears to

---

[4] Moreover, although not what ShipCycle sought in its pre-deadline request, *post hoc* extensions of deadlines are not "barred by the precedent of this Court," as the Government claims. *Geo-Seis Helicopters*, which the Government cites for support, is a single decision from one former judge of this Court. Although entitled to respect, *Geo-Seis Helicopters* is not binding precedent, and other judges of this Court are free not to follow it. To this day, the GAO does not follow it. *See, e.g.*, *Nat'l Disability Rights Network, Inc.*, B-413528, 2016 CPD ¶ 333, 2016 WL 6809939 at \*6 (Comp. Gen. Nov. 16, 2016) ("[T]here is no prohibition against a procuring agency issuing an amendment to extend the closing time for receipt of proposals after that time has passed to accommodate even one offeror, where the motivation for the extension is enhanced competition."). Thus, even when ShipCycle subsequently requested a *post hoc* extension, the Navy had the option of following the GAO's reasonable precedents rather than *Geo-Seis Helicopters*. In any event, *Geo-Seis Helicopters* is irrelevant to extensions that are sought and granted **before** a deadline has passed, which is what this protest ground is about.

[5] The email extension 27 minutes before the deadline in *Guardian Moving* shows there was nothing inherently improper or impossible in ShipCycle's similar request for an extension half an hour before the deadline in this procurement.

be the Government's argument here. 122 Fed. Cl. at 134.[6] The Court also rejected the protester's argument—which is essentially the Government's argument in this case—that a last-minute extension granted to benefit a single offeror was somehow improper and prejudicial to offerors that had already submitted their FPRs on time. *Id.* at 135. The Court held that an extension granted to all offerors (even those that did not need it) is neither improper nor prejudicial. *Id.*

Intervenor says ShipCycle "takes the position that contracting officers may only enforce submission deadlines if they can articulate a strong basis for them after the fact." ECF 46 at 37. That is not our position. ShipCycle's position is that a contracting officer's discretion is not unfettered, and any exercise of discretion requires a rational basis. The record shows that the Contracting Officer here had overwhelming cause— ██████████ savings for the American taxpayer and a ██████████ rating—to grant ShipCycle's timely pre-deadline request for an extension of the submission deadline. Under these facts, a brief extension was the obvious choice "to maximize the agency's ability to obtain the best value," with zero downsides to the Navy. *See MCR Fed., LLC*, B-416654.2, *et al.*, 2019 CPD ¶ 335, 2018 WL 9877998 at *6 (Comp. Gen. Dec. 18, 2018). The record documents ***no basis***—whether rational or irrational, strong or weak—for not granting the request under the unique facts of this procurement. If that total silence is good enough, as the Government and Intervenor say it is, it means a contracting officer's discretion is boundless and unreviewable for abuse when it comes to proposal deadlines. That is not the law.

---

[6] Like the Court, the GAO also recognizes emails and other writings as valid amendments if they are "in writing, signed by the contracting officer, and provided to all offerors"—even if they are not issued as Standard Form 30 PDFs. *See Zolon PCS II, LLC; Polaris Consulting Group, Inc.*, B-420745.2 *et al.*, 2023 CPD ¶ 227, 2023 WL 6460991 at 9 n.6 (Comp. Gen. Sept. 20, 2023); *Energy Eng'g & Consulting Servs., LLC*, B-407352, 2012 CPD ¶ 353, 2012 WL 6691536 at 3 (Comp. Gen. Dec. 21, 2012)(recognizing question-and-answer email from contracting officer to offerors constituted an amendment of the solicitation's requirements).

██████████████████████████████████████

Intervenor also claims that ShipCycle argues that "when evaluating an extension request, a Contracting Officer must review the late proposal." ECF 46 at 38. ShipCycle does not argue that. Rather, when a contracting officer receives a **_pre-deadline_** extension request from a highly-rated offeror whose **_initial offer_** represented ▮▮▮▮▮▮ savings over the next lowest (and ▮▮▮▮▮ ) proposal, it is unreasonable not to take that into account. The Late Is Late rule does not forbid it, because the Late Is Late rule is not implicated before a deadline has passed.

Intervenor also attempts to distinguish the cases on which ShipCycle relies because none of them involved a request to extend a proposal deadline. ECF 46 at 36-37 (arguing that *MCR Federal, LLC* is relevant only to the reasonableness of the initial setting of a deadline but not to consideration of a requested extension of a deadline that was reasonable when it was first set), 339-40 (arguing that *Level 3 Communications, LLC v. United States*, 129 Fed. Cl. 487 (2016) and *BCPeabody Construction Services, Inc. v. United States*, 112 Fed. Cl. 502 (2013) are inapposite because they did not involve decisions to extend deadlines). These are distinctions without a difference. The decisions all stand for the proposition that, even in highly discretionary areas (like not conducting clarifications), discretion is not absolute and must take into account important parts of a question like the potential for multimillion-dollar savings and the fact that a brief extension would have no adverse effect on the procurement or operational requirements.

Intervenor's position appears to be that, once a deadline is reasonably set, it is never an abuse of discretion for a contracting officer to refuse to extend it. *See id.* at 40 ("This is a simple case presenting a simple issue. A contracting officer may establish and enforce a submission deadline."). No one disputes a contracting officer's broad discretion to establish and enforce a submission deadline. That's not what this protest is about.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The question here is whether, when faced with a reasonable pre-deadline request from one of *only three* offerors for a brief extension to the common submission deadline, and the ███████ savings and ███████ that ShipCycle had *already* been evaluated as offering, and the new technological obstacles ShipCycle's experienced proposal team encountered on submission day, and the lack of any reason not to extend, was it an abuse of discretion *under these specific facts* not to grant the extension?  ShipCycle has made its case for why it was an abuse of discretion. The record does not document the Contracting Officer's rationale.  That is a sufficient basis for finding success on the merits, as the Court is unable to determine under these facts and on this record that the Contracting Officer had a rational basis for exercising discretion in this way.  At the very least, it is a sufficient basis for remanding to the Navy to consider (for the first time) ShipCycle's timely and reasonable request for a deadline extension and document a rational basis for either granting or denying the pre-deadline extension request.  It was a reasonable request that would have saved more than ███████ and should be given fair consideration now.

Resolving the protest in this fashion would allow the Court not to reach the question of whether ShipCycle has satisfied an exception to the Late Is Late rule, or whether the submission problems were caused by the Government's computer system.  The Navy could also save time and spare the Court a decision altogether by voluntarily requesting a remand to consider the request and document a response.

**B. The Navy's Decision to Eliminate ShipCycle from Consideration Is Unreasonable Because the Government Control Exception Applies.**

In our opening brief, we showed that ShipCycle's FPR arrived at the Government installation designated for receipt of offers (the Government's PIEE system) and was under the Government's control by the 3:00 p.m. deadline.  Although persistent problems with the system prevented ShipCycle from completing the formalities of pressing the "sign" and "submit" buttons

8

on PIEE's user interface by the deadline, that does not change the fact that the documents (which ShipCycle had already signed the old-fashioned way) had been uploaded onto the Government's PIEE system and were under the Government's control by 3:00 p.m.  Considering the FPR would not have delayed the procurement at the time.  And, given the ongoing inability of NorthStar's facility to receive the ship and begin work, and the decision not to attempt to move the ship during hurricane season, it would not delay the procurement for the Navy to consider the FPR now.  The Government and Intervenor disagree, but their disagreement is without merit.

              1.      **The Record Demonstrates That ShipCycle's FPR Timely Arrived at the Government Installation Designated for Receipt of Offers.**

The Government and NorthStar assert that PIEE did not actually receive ShipCycle's FPR by the deadline.  ECF 46 at 41; ECF 47 at 46.  The Government avoids engaging with the screenshots of the ShipCycle FPR documents listed on PIEE before 3:00 and focuses instead on an error message and icons in the same document.  ECF 47 at 46-47.  NorthStar's argument is different and attempts to distinguish between the contractor's "side" of PIEE and the Government's, arguing that the Government installation designated for receipt of offers was really the "***Government's side*** of PIEE, which actually 'receives' a proposal once submitted through PIEE."  ECF 46 at 49 (emphasis added).  The Solicitation instructions did not require (or even mention) "sides" of PIEE.  AR Tab 14 at 177.

The relevant question for the Government Control Exception is whether the PIEE system received ShipCycle's FPR.  *See Insight Sys.*, 110 Fed. Cl. at 577 (applying definition of "receive" to hold that Government Control Exception applied when the server "took" plaintiff's electronic messages).  "The word 'receive' is defined principally as an action 'to take or acquire (something given, offered or transmitted).'"  *Id.* (citing The American Heritage College Dictionary 1139

(1997)).  By the plain meaning of that term, the PIEE website received ShipCycle's FPR when ShipCycle first uploaded the FPR to PIEE, which occurred prior to the 3:00 p.m. deadline.

At Tab 88, the record reflects, via multiple screenshots, each FPR document uploaded to the PIEE system by the deadline.  AR Tab 88 at 9825–26.  The Government and Intervenor argue one cannot be sure those screenshots show the documents were really uploaded, pointing to varying lengths of each screenshot to imply that ShipCycle doctored the images.  ECF 46 at 51; ECF 47 at 46.  These "inconsistencies" simply reflect that different screenshots were taken to capture the entirety of ShipCycle's FPR upload.  Unsatisfied with Tab 88, NorthStar further contends that Tab 88 "does not show that ShipCycle's FPR was 'sent through' PIEE and received by the Government."  ECF 46 at 49.  Yet that is precisely what Tab 88 shows.  Contrary to NorthStar's contention that Tab 88 is unacceptable evidence and that there is no evidence that the attachments shown in Tab 88 were transmitted to PIEE, *id.* at 51, Tab 88 plainly demonstrates that ShipCycle successfully transmitted its FPR to PIEE.  AR Tab 88 at 9825–26.  The screenshots in Tab 88 unmistakably show the output of the Government's PIEE system.  *Id.*

NorthStar's reliance on the PIEE Program Management Office's ("PMO") analysis to demonstrate otherwise, ECF 46 at 50, is similarly unavailing.  The PIEE PMO identified "submissions" to PIEE, AR Tab 94 at 9838, by which it meant uploaded documents that completed the formalities of the subsequent *"sign" and "submit"* process.  *See id.* (listing only documents that completed sign and submit process).  The Government failed to retain (or failed to produce) any evidence of what ShipCycle *uploaded* to PIEE, which is what is relevant to the Government Control Exception analysis.  The record logs showing "submission" reflect only a completed electronic sign-and-submit process (which ShipCycle admits was not completed by 3:00 p.m.) but not the successful *upload* of the FPR to PIEE (which the Tab 88 screenshots show did occur by

3:00 p.m.). *Id.* We agree it would have been ideal if the produced record showed PIEE's own timestamped receipt of the uploads, but the Government has not documented that information for any of the offerors. Under the circumstances, the screenshots are the best evidence available.

NorthStar cites *Syncon, LLC v. United States*, 154 Fed. Cl. 442 (2021), for the principle that screenshots do not prove an upload, ECF 46)at 49, but that case is distinguishable. There, Judge Bruggink rejected a protester's assertion that it submitted its proposal to the designated installation—DOD SAFE. *Syncon*, 154 Fed. Cl. at 457. The *Syncon* protester relied on "screenshots showing that it ***accessed*** DOD SAFE six different times," and protester's screenshots "depict[ed] 'browser history artifacts that show they had ***visited*** the site.'" *Id.* (emphasis added). Unlike *Syncon*, however, ShipCycle has evidence it actually ***uploaded*** its FPR to PIEE, and not merely "accessed" or "visited" PIEE or attempted to upload. AR Tab 88 at 9825-26. Judge Bruggink found unconvincing the "***attempt*** to upload a proposal," *Syncon*, 154 Fed. Cl. at 457 n.18 (emphasis added), but ShipCycle ***did*** upload its proposal. AR Tab 88 at 9825-26. *Syncon* is thus distinguishable.

The Government's reliance on *Naval Systems, Inc. v. United States*, 153 Fed. Cl. 166 (2021), suffers from similar problems. There, Judge Solomson rejected "bald assertions of [a protester's] employees," where the Government searched the DOD SAFE "database for [submitter's] IP address, which demonstrated that while his IP address had connected to DoD SAFE seventeen times in 2020, it did not connect to the system at all in September or October 2020, the time during which [protester's] proposal was allegedly uploaded." *Id.* at 187–88.

Here, by contrast, the record demonstrates both that ShipCycle did connect to the system on the day it uploaded the documents, AR Tab 94 at 9839, and that the DLA and DISA support personnel failed to conduct the detailed analysis provided in *Naval Systems*. In fact, when the

Contracting Officer reasonably asked DISA to tell him what ShipCycle had uploaded and when, he was told that DISA Service Management does not store information relating to the submission of proposals. AR Tab 93 at 9836. The PIEE PMO sent the Contracting Officer only information relating to completion of the "sign-and-submit" process, not the successful uploads, AR Tab 94 at 9838. It was the upload information that was needed to complete a Government Control Exception analysis. The Government did not preserve that information, but ShipCycle did by diligently making screenshots to document what was occurring. AR Tab 88 at 9825-26. Judge Solomson recognized that screenshots could be acceptable evidence of upload when he stated that the *Naval Systems* protester "could have taken a ***screenshot*** or printed a hardcopy of the alleged successful upload notification." *Naval Sys.*, 153 Fed. Cl. at 188. ShipCycle did just what Judge Solomson recommended.

NorthStar seeks to split PIEE into two halves, a Government-facing side and an offeror-facing side. ECF 46 at 49. That dichotomy has no basis in the record. The Solicitation required offerors to submit proposals "through the Procurement Integrated Enterprise Environment (PIEE) website Solicitation module."[7] AR Tab 14 at 177. The Contracting Officer's instructions to offerors further stated that "Final Proposal Revisions shall be submitted via PIEE and directed to Robert Whitlow . . . and James McGowan[.]" AR Tab 45 at 7869. Neither the Solicitation nor the instructions distinguish between a Government-facing "side" or an offeror-facing "side." NorthStar's argument that a FPR is not received by PIEE until it is moved to a particular "side" is contrary to the terms of the Solicitation and unsupported by the record, and irrelevant for Government Control Exception analysis.

---

[7] Block 9 of Standard Form 33 further provides that "[s]ealed offerors . . . will be received at the place specified in Item 8, or if handcarried, in the depository located in PIEE." AR Tab 14 at 97.

NorthStar also cites *Insight Systems Corporation v. United States* and *Syncon, LLC v. United States* for potential support, ECF 46 at 49, but these cases are inapposite. As to *Insight Systems*, NorthStar characterizes this case as holding that a "server controlled by the government" can be an "installation that receives electronic submissions." *Id.* (quoting *Insight Sys.*, 110 Fed. Cl. at 578). In *Insight Systems*, Judge Allegra held that the Government Control Exception can apply to electronic submissions of proposals. 110 Fed. Cl. 564, 578 (2013) ("[T]he court has little difficulty in concluding that—much like a mail room or other depository in a building, to which paper proposals can be delivered—a server controlled by the government most certainly can be an 'installation' that receives electronic submissions."). Here, PIEE is a Government-controlled system. Notwithstanding Intervenor's argument over the supposed "sides" of PIEE, once a proposal "is received by a government server" designated for receipt of proposals, one of the prongs for the Government Control Exception is fulfilled. *See id.* at 577 (holding that electronic server's receipt of proposal qualifies "under this exception").

NorthStar cited *Syncon* for the proposition that there is a Government-facing "side," focusing only on Judge Bruggink's statement that the website "did not record a submittal" until after the deadline. ECF 46 at 49 (quoting *Syncon*, 154 Fed. Cl. at 458). NorthStar reads too much into Judge Bruggink's statement. There, the solicitation provided that the submittal website would "record the date and time of package submittal [and] [t]he date and time of package submittal recorded in [the system] shall govern the timeliness of any proposal submission." *Syncon*, 154 Fed. Cl. at 458 (citation omitted). Under this language, Judge Bruggink found the Government Control Exception was not met because, "[a]side from the statements of Syncon's employees to the effect that Syncon tried to submit its files, there [was] no other evidence supporting the conclusion that plaintiff successfully uploaded its proposal in a timely manner or that the

government received it before the solicitation's deadline." *Id.* at 457–58. But this analysis has no bearing on whether there is a Government-facing "side" to the PIEE system. The receipt prong of the Government Control Exception requires only that a proposal be received at the Government installation designated for receipt of proposals. FAR 5.208(b)(1)(ii). Here, that installation is PIEE—not some "side" of PIEE—and *Syncon* does not say otherwise.

ShipCycle thus meets this first prong of the Government Control Exception.

> **2.  The Record Demonstrates that ShipCycle's FPR Was Under the Government's Control.**

The Government and NorthStar argue that, even if PIEE received the FPR on time, the FPR was not under the Government's control because ShipCycle could still edit its FPR. Not so. Once ShipCycle uploaded its FPR, ShipCycle could not edit its FPR unless it removed the FPR from the PIEE Solicitation Module. Though the Government and NorthStar argue otherwise, ShipCycle relinquished control of its FPR once it uploaded the FPR to PIEE.

The Government argues it is "axiomatic that a proposal that can still be edited is not final and is not in the Government's control." ECF 47 at 48 (citing *Elec. On-Ramp, Inc. v. United States*, 104 Fed. Cl. 151, 163 (2012)). We agree, but ShipCycle's uploaded FPR *was* final. As Judge Damich noted in the case the Government cites, "a proposal is under the government's control when the offeror relinquishes control over the proposal such that it no longer can modify the proposal." *Elec. On-Ramp.*, 104 Fed. Cl. at 163. That is precisely what ShipCycle did upon uploading its FPR.

The Government cites PIEE documentation to argue that, even after upload, ShipCycle could still edit the documents. ECF 47 at 47 (citing PIEE Solicitation Training, *Submit Final Proposal Revision*, at 7–9; PIEE Solicitation Training, *Proposal Manager Functions*, at 7–11). But the cited documentation establishes that uploaded attachments *cannot* be edited. Once

14

ShipCycle uploaded its FPR, the only way for ShipCycle to edit any material information in its FPR volume was to *delete* the attachment and upload a *new*, edited attachment. *See* PIEE Solicitation Training, *Proposal Manager Functions*, at 3–7 (providing only for edits of attachment names and identifying attachment types but not editing the *content* of the attachment).[8] The Government further argues that the Government really does not have control of a proposal until the electronic "signing" and "submission" procedure is completed, which then generates automated notices "to ensure submission status is clear." ECF 47 at 47. This procedure is a nice feature (when it works), but it does not alter the fact that ShipCycle relinquished its ability to revise the uploaded FPR documents once they were on the PIEE system. *See* PIEE Solicitation Training, *Proposal Manager Functions* at 9–11. That means they were under Government control.

In the same vein, NorthStar asserts that ShipCycle's ability to "Delete" files or "Choose Files" necessarily entails that the Government does not have control over ShipCycle's FPR, ECF 46 at 45, but the FAR contradicts such an assertion when it permits any offeror to delete its entire proposal at any time prior to award. FAR 15.208(e). If the theoretical ability to delete a proposal file in PIEE means the Government lacks control over the proposal, then the Government never has control over any proposal, as the offeror is free under the FAR to revoke the whole proposal at any time before award. The theoretical possibility of deletion or withdrawal cannot mean the Government lacks control. ShipCycle did not remove its FPR or notify the Government that it was going to withdraw its proposal—quite the opposite, it spent hours trying to complete the process for its uploaded files. Accordingly, ShipCycle's FPR was under the Government's control.

---

[8] "[G]enerally, 'publicly available documents' may be 'freely cited' even without being included in the administrative record." *Crowley Gov't Servs., Inc. v. United States*, 171 Fed. Cl. 453, 468 (2024) (quoting *Harkcon, Inc. v. United States*, 132 Fed. Cl. 697, 701 (2017)); *see also* ECF 47 at 40 n.9.

15

NorthStar relies on *Johnson Controls Government System, LLC v. United States*, 125 Fed. Cl. 289 (2016), for the principle that "[i]f an offeror has control over the contents of its proposal, the government necessarily does not have control." ECF 46 at 45 (citing *Johnson Controls*, 125 Fed. Cl. at 293). NorthStar characterizes that case for the broad proposition that there could be no Government control unless an agency is in possession of the proposal and has no way of accessing it until an offeror submitted it to the agency. *Id.* (citing *Johnson Controls*, 125 Fed. Cl. at 293). In *Johnson Controls*, Judge Wheeler rejected a protester's argument that it "could have but did not change or withdraw its proposal after filing." *Johnson Controls*, 125 Fed. Cl. at 293. In reaching this decision, Judge Wheeler did not consider whether the proposal was under the ***Government's*** control, and instead, he accepted the explanation that the "[Department of Energy] was not in possession of the proposal." *Id.* at 293. Judge Wheeler, in *Johnson Controls*, took the same mistaken position as the Navy. Like the Navy, *Johnson Controls* references the ***agency's*** control, *id.*, rather than the Government's control—as the FAR plainly indicates. FAR 15.208(e). This is not a mere "distinction without a difference," as NorthStar contends, ECF 46 at 45; this distinction goes to the FAR's plain language. Much like the Navy in the instant protest, the *Johnson Controls* decision does not examine whether the Government ***received*** the proposal once the protester uploaded its proposal to the ***designated installation***. *See Johnson Controls*, 125 Fed. Cl. at 292–93 ("However, as Defendant points out, DOE was not in possession of the proposal and had no way of accessing it until Plaintiff submitted it ***to the agency***, and thus the proposal was clearly not 'under the Government's control' as required by the FAR.") (emphasis added). But, as explained in Section I.B.i, *supra*, the Government Control Exception is triggered once the proposal reaches the designated installation (here, PIEE), not the agency (the Navy). The *Johnson Controls* decision conflates receipt and control, but as the facts of this case demonstrate, there is a nuance in the

16

receipt of proposals that *Johnson Controls* did not consider. Much like submission in *Insight Systems*—where emails directed to the agency would pass through multiple computer servers before ultimately reaching the agency, 110 Fed. Cl. at 570—there is an intermediary step between a procuring agency receiving a proposal and the offeror uploading its proposal. It is at this intermediary step where an offeror relinquishes control of the proposal, and the Government assumes control. *Johnson Controls* did not consider this crucial fact, and is, therefore, distinguishable.

Accordingly, ShipCycle's FPR was under the Government's control.

### 3. The Agency's Decision Not to Apply the Government Control Exception Is Unsupported by the Record.

Intervenor argues that the Agency's decision not to apply the Government Control Exception was reasonable because it "performed a robust and detailed investigation into whether the Government Control exception applied." ECF 46 at 46 (citing AR Tab 103 at 9915–19). Yet, despite having received the screenshots showing upload of the FPR documents to PIEE by the deadline, the Navy did not consider these screenshots. *See generally* AR Tab 103 (describing screenshots of errors but not of the uploaded documents). NorthStar cites the Navy's reference to the letters sent on April 24 and May 4, 2025, as evidence the Navy referenced supporting documents that include Tab 88, ECF 46 at 46 (citing AR Tab 103 at 9915), but the Navy's decision to eliminate ShipCycle from consideration hardly discusses those letters.

The Navy's failure to acknowledge the upload screenshots or to whether ShipCycle's uploaded FPR was ***received*** at PIEE by the deadline (rather than merely considering whether the subsequent "sign and submit" process was completed by that time) was arbitrary and capricious. This was a critical omission. Under the Administrative Procedure Act standard, "[c]ourts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to

consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.- Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009).

The record demonstrates that the Navy failed to consider an important and necessary aspect of the Government Control Exception, and its explanation of an untimely submission runs counter to the evidence before it. Therefore, the exclusion of ShipCycle's FPR was arbitrary and capricious.

### C. In the Alternative, the Navy Unreasonably Eliminated ShipCycle's FPR When ShipCycle Was Not at Fault for the Technical Issues Affecting the PIEE "Sign and Submit" Process on the Afternoon of the Deadline Day.

In our opening brief, we explained the Contracting Officer's decision to exclude ShipCycle's proposal is based on incorrect and incomplete information, and we further explained the Navy's failure to retain information on the submission of user or any user data. ECF 42 at 34– 35. This provides an alternative basis on which to sustain the protest, if the Court does not find that ShipCycle has established success on its other protest grounds.

Relying on a few sparse and largely unhelpful responses from DISA, the Government and NorthStar argue that these pervasive and extended problems were a localized issue with ShipCycle, not PIEE. ECF 46 at 48 (citing AR Tab 103 at 9917); ECF 47 at 47 (quoting AR Tab 103 at 9917). The Government and NorthStar read the DISA statements to prove much more than they actually demonstrate.

The Navy's contemporaneous conclusions about the submission obstacles do not demonstrate that the PIEE system did not malfunction or create the other errors that prevented ShipCycle from completing the "sign and submit" process by the FPR deadline. The Navy stated

18

that "DISA determined that the network error described by Mr. Dalrymple is a localized error and 'would not be related to PIEE.'" AR Tab 103 at 9918. DISA specifically stated that there were "[n]o reported outages of [the] PIEE site yesterday. All applications and site where [*sic*] functioning 100% yesterday. Network error James described is localized and would not be related to PIEE." AR Tab 92 at 9834. The PIEE PMO also summarized these circumstances stating that "there were NO system issues with PIEE eBusiness Suite on April 23, 2025, and many vendors were able to submit their proposals for this specific solicitation on time." AR Tab 94 at 9838 (emphases removed). These statements confirm only two facts: there was no overall outage with the PIEE website on that day, and vendors were able to submit proposals. These statements, however, do not demonstrate that the PIEE website did not *malfunction* short of a total outage.

Finally, the fact that NorthStar and the third offeror were able to submit proposals (on the day before and the morning of the deadline), *id.*, is not evidence that the PIEE website was functioning at the time ShipCycle uploaded its proposal (on the afternoon of the deadline). These successful submissions only demonstrate that the PIEE website was functioning properly at those times. Neither DISA nor the PIEE PMO offered the Navy any explanation for what specific non-PIEE issue would have caused the documented error messages, expired sessions, or interminable "Please Wait" spinning icons that ShipCycle's personnel experienced only on that day. AR Tab 80 at 9799-9800; AR Tab 88 at 9826.

## II.     THE MOTIONS TO DISMISS FAIL BECAUSE ENERGYSOLUTIONS HAS DERIVATIVE STANDING TO STEP INTO THE SHOES OF THE OFFEROR AND PROTEST ON ITS BEHALF.

Finally, we respond in opposition to the Government and Intervenor's Motions to Dismiss for lack of standing or because EnergySolutions allegedly failed to satisfy Rule 23.1's demand requirement.

### A. EnergySolutions Has Derivative Standing to Step into ShipCycle's Shoes.

The Government and Intervenor assert that EnergySolutions lacks statutory standing to maintain this bid protest because it is not an "interested party" under 28 U.S.C. § 1491(b)(1). *See* ECF 46 at 17-18; ECF 47 at 34. It is undisputed that EnergySolutions did not submit an offer in response to the Solicitation and cannot, itself, qualify as an interested party. The defect in the Government and Intervenor's motions is that EnergySolutions is not protesting in its own name. Rather, EnergySolutions is bringing this protest as a derivative plaintiff in ShipCycle's name. EnergySolutions is the minority member of ShipCycle, which, as an offering entity, is indisputably an interested party. Accordingly, EnergySolution's standing hinges entirely and exclusively on whether it has derivative standing to step into ShipCycle's shoes.

Similarly, the Government and Intervenor argue that EnergySolutions lacks standing to bring a bid protest under the Federal Circuit's recent decision in *Percipient.ai, Inc. v. United States*, No. 2023-1970, 2025 WL 2472671 (Fed. Cir. Aug. 28, 2025). *See* ECF 46 at 18; ECF 47 at 34. In that case, the *en banc* Federal Circuit stated that, in a bid protest, the term "interested party" is limited to actual or prospective offerors whose direct economic interest would be affected by the award of the contract. *Percipient.ai*, 2025 WL 2472671 at \*6, \*12. However, that decision concerned a subcontractor's standing to protest in its own name, not a derivative plaintiff's ability to bring a protest on behalf of an indisputably interested party. Contrary to the Government and Intervenor's arguments, ShipCycle's minority venturer has never claimed to be an "interested party" with standing under the Tucker Act. Plaintiff clearly explained in its Amended Complaint that ShipCycle is the interested party with standing to protest the award. Am. Comp. ¶ 7. EnergySolutions merely has derivative standing to bring this protest on ShipCycle's behalf. *Id*.

The Government and Intervenor's motions ignore the purpose of derivative suits, which is to enforce a corporate right that the corporation has refused for one reason or another to assert. *See e.g., Suess v. United States*, 33 Fed. Cl. 89 (1995) (shareholders had standing to maintain derivative breach of contract action against United States even if they did not have standing as individuals; derivative suit is brought on behalf of corporation and, thus, individual standing is not required).

The Amended Complaint and our opening brief cite *First Hartford Corp. Pension Plan & Tr. v. United States*, 194 F.3d 1279 (Fed. Cir. 1999), to support the Court of Federal Claims' ability to hear derivative actions. *See* Am. Compl. (ECF 41) ¶ 8; ECF 42 at 16. In that case, the Federal Circuit recognized that derivative suits merely "permit[] shareholders to step into the shoes of the corporation and file suit as fiduciaries on the corporation behalf and for the corporation's benefit." *First Hartford,* 194 F.3d at 1293 (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 549 (1949)).

The Government and Intervenor argue that *First Hartford* does not apply here because it involved a breach of contract action, rather than a bid protest, and a conflict of interest involving a contractor with a putative claim of breach by a federal agency that was being operated by that very same federal agency, which does not exist here. ECF 46 at 20-22; ECF 47 at 35. The Government contends that "28 U.S.C. § 1491(b) should not be so expansively interpreted as to permit Energy Solutions to bring this derivative suit." ECF 47 at 36.

In *First Hartford*, the Government similarly argued there is no derivative standing (at all) at the Court of Federal Claims, but the Federal Circuit found otherwise. *First Hartford*, 194 F.3d at 1293 (recognizing that contract actions can be brought derivatively by shareholders on behalf

21

of corporations in some circumstances).  The fact that the Federal Circuit has not yet examined whether derivative standing applies to bid protests does not mean that it does not.

Furthermore, although there is no conflict of interest between ShipCycle and the federal Government, that does not prohibit EnergySolutions from bringing a derivative suit.  The Federal Circuit did not hold that there is derivative standing only when the Government has taken receivership of a party with direct standing.  Rather, the Federal Circuit noted that the conflict of interest faced by the agency in determining whether to bring suit weighed in favor of allowing the plaintiff in that case to bring derivative suit and stated, "[w]e neither infer nor express an opinion on the standing of derivative plaintiffs in other circumstances."  *Id.* at 1295.  In other words, the Federal Circuit did not address the permissibility of derivative protests one way or the other.

The Government and Intervenor fret that permitting derivative bid protests will impermissibly broaden the waiver of sovereign immunity under the Tucker Act.  *See* ECF 47 at 35; ECF 46 at 23-24.  The Federal Circuit has already recognized that "[t]he procedural device of derivative actions does not broaden the scope of the waiver of sovereign immunity."  *First Hartford*, 194 F.3d at 1293; *see also id.* at 1294 (concluding "the Court of Federal Claims possesses jurisdiction to hear shareholder derivative suits").  Derivative suits permit shareholders to step into the shoes of the corporation and file suit as fiduciaries on the corporation's behalf and for the corporation's benefit.  Accordingly, permitting derivative bid protests would not extend the jurisdiction of the Court of Federal Claims to a class of claims not previously within its jurisdiction.

NorthStar recites a parade of horribles, speculating that "[p]erhaps ShipCycle has diverted its resources or key personnel to other areas, and can no longer perform the Solicitation's scope of work."  ECF 46 at 24.  "In fact, the Court does not even know if ShipCycle still exists as a corporate entity."  *Id.*  These concerns are pure speculation (and untrue).  If the joint venture were defunct

or unwilling to perform if awarded, EnergySolutions would not be pursuing this protest in the joint venture's name. As the movants, the Government and Intervenor have the burden of showing diversion of resources, winding down, or other evidence suggesting that ShipCycle is no longer able or willing to perform, which they have not even attempted to do (and could not do even if they tried). Therefore, NorthStar's speculation regarding the continued availability or capability of ShipCycle should be ignored.

NorthStar also argues that Rule 23.1 is not a substantive basis of derivative actions, but merely sets forth procedural pleading requirements. *See* ECF 46 at 26-27. Plaintiff does not argue otherwise. As the disappointed offeror, ShipCycle is the interested party in this protest. As a derivative plaintiff, EnergySolutions stepped into ShipCycle's shoes to pursue this protest in ShipCycle's name to protect ShipCycle's interests.

Similarly, NorthStar argues that state law does not grant EnergySolutions bid protest standing in federal court. *See* ECF 46 at 27. Again, Plaintiff agrees. We cited Delaware law to foreclose arguments that LLCs do not count as corporations for derivative suit purposes. *See* Am. Compl. ¶ 8 n.1 ("ShipCycle is a Delaware limited liability company. Delaware law governs ShipCycle's internal affairs, and it permits derivative suits by LLC members.").

**B. EnergySolutions Satisfied Rule 23.1.**

Rule 23.1 requires a plaintiff bringing a derivative suit to "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority . . . and (B) the reasons for not obtaining the action or not making the effort." RCFC 23.1(b)(3). Mr. Morrison's declaration in Appendix A to the Amended Complaint details EnergySolutions' efforts to persuade HII's representatives on ShipCycle's Board to authorize the joint venture to bring this protest. *See* Am. Compl. ¶ 12 (quoting Appendix A). However, ShipCycle's chairman (and

23

simultaneously president of HII Nuclear Inc.'s Global Security Group) told Mr. Morrison "unequivocally that neither he nor the other ShipCycle Board member from Huntington Ingalls, Mr. Michael Helpinstill, would vote in favor of pursuing the protest at Court." *Id*. Based on these statements, EnergySolutions concluded it would be futile to call for a ShipCycle Board vote.

The Federal Circuit has held, "[t]he very object of the derivative suit mechanism is to permit shareholders to file suit on behalf of a corporation when the managers or directors of the corporation, perhaps due to a conflict of interest, are unable or unwilling to do so, despite it being in the best interests of the corporation." *First Hartford*, 194 F.3d at 1295.

Here, HII's representatives on ShipCycle's Board were unwilling to pursue a bid protest on behalf of ShipCycle because they were worried about antagonizing HII's primary customer, the Navy. *See* Am. Compl. ¶ 12 (quoting Appendix A). The Enterprise decommissioning effort was ShipCycle's only focus, and EnergySolutions offered to cover the costs of protesting. *Id*. As a result, there was no cost risk to ShipCycle or other business reason for ShipCycle not to pursue a protest. *Id*. HII's representatives on ShipCycle's Board prioritized protecting HII's relationship with the Navy over doing what was best for ShipCycle. HII's representatives on the joint venture board did not oppose litigation because they thought it would not be in ShipCycle's best interest; they opposed litigation because they thought it would not be in HII's best interest. Given this conflict of interest and the ShipCycle chairman's unequivocal refusal to entertain a protest at the Court, ShipCycle reasonably concluded that further demand or action would have been futile.

The Government and Intervenor argue that the Court can dismiss the Amended Complaint under Rule 23.1 because EnergySolutions did not satisfy the demand requirement or sufficiently prove futility in making that demand. (ECF 47) at 29; ECF 46 at 28-30. To start, they argue that Delaware law defines the demand requirement and futility exception for derivative suits in federal

court and advocate for the application of a strict, three-prong test from *United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034 (Del. 2021). ECF 47 at 33; ECF 46 at 30-31. The court in *Zuckerberg* stated:

> courts ***should*** ask the following three questions on a director-by-director basis when evaluating allegations of demand futility: (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand; (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.

262 A.3d at 1059 (emphasis added). Significantly, in adopting this three-pong test, the court suggested that future courts "should" consider these three questions, not that they "must" consider these three questions, when assessing whether the demand requirement should be excused as futile.

The Court does not need to consider the *Zuckerberg* test because there are enough facts for the Court to find that ShipCycle did essentially make a demand to ShipCycle's Board to initiate a protest at the Court, *see* Am. Compl. at 5; *see also* ECF 47 at 30 (where the Government recognized the same), and it was unjustifiably rejected. Mr. Morrison's declaration states, "ShipCycle's Board met and discussed the potential protest, but did not put the issue to a vote or take any formal action." ECF 41-1 at A-3. In a phone conversation following that meeting, the chairman made it unequivocally clear that neither he nor the other board member from HII would vote in favor of authorizing this protest. *Id*. at A-4. In other words, the ShipCycle Board discussed the matter and chose not to authorize the protest. *Id*. EnergySolutions' actions in requesting at the Board meeting that ShipCycle file a protest at the Court and related discussions with Mr. Lempke constitute a

demand. In this regard, the Board's failure to act in the face of a direct request to do so, coupled with the statement that it would not so act, were a rejection of the demand.

As Mr. Morrison's declaration states, the Enterprise decommissioning effort was ShipCycle's only focus, and EnergySolutions offered to cover the costs of filing a protest in this Court, so there was no cost risk to ShipCycle or other business reason for ShipCycle not to pursue a protest. *Id*. The declaration further states, the HII representatives on ShipCycle's Board had been "instructed they would never authorize nor support" a Court of Federal Claims protest "because of Huntington Ingalls' larger relationship with the Navy and its belief that taking no further action was in Huntington Ingalls' best interest." *Id*. at 12. HII's representatives on ShipCycle's Board prioritized protecting HII's relationship with the Navy over doing what was best for ShipCycle. This decision evinces a significant conflict of interest and should not be shielded by the business judgment rule.

Alternatively, EnergySolutions contends that its conversations with the HII representatives on ShipCycle's Board made it clear that further action would be futile, thus excusing the demand requirement. Even if the *Zuckerberg* test applies, EnergySolutions satisfies the futility exception, at least in spirit, because half of the members of ShipCycle' Board are beholden to HII's interests and lack the independence necessary to do what is best for ShipCycle. This is consistent with the purpose of the demand-futility exception in Delaware. The Supreme Court of Delaware stated, "[t]he purpose of the demand-futility analysis is to assess whether the board should be deprived of its decision-making authority because there is reason to doubt that the directors would be able to bring their impartial business judgment to bear on a litigation demand." *Zuckerberg*, 262 A.3d at 1059. As the declaration in Appendix A shows, HII has other Navy business interests that created

a conflict for the HII directors, whose loyalty to HII was stronger than their loyalty to the JV. Therefore, any further demand or action by EnergySolutions would have been futile.

### III.    A PERMANENT INJUNCTION IS WARRANTED.

Permanent injunctive relief is warranted.  As demonstrated above, ShipCycle succeeds on the merits of its claim.  NorthStar contends ShipCycle did not suffer irreparable harm, but because ShipCycle lost the opportunity to have the Agency evaluate its FPR, such harm was demonstrated. *Fed. Acquisition Servs. Team, LLC v. United States*, 124 Fed. Cl. 690, 708 (2016) (citation omitted).  The only argument the Government raises against the showing of irreparable harm (or any injunctive factor other than merits) is that the lost opportunity for experience on Navy contracts is "curious given that ShipCycle's majority shareholder, HII, is one of the Navy's largest and most frequently used contractors."  ECF 47at 50 n.14.  There is nothing "curious" about ShipCycle's desire for valuable Navy experience, and all contractors (even ones that are already very experienced) benefit from new favorable past performance and experience.

Further, the balance of harms favors ShipCycle.  Although NorthStar (but not the Government) alleges that the CVN 65 is occupying valuable dock space and poses a health and safety risk, work on the CVN 65 could not commence at the designated place of performance, regardless. Am. Compl. ¶ 79. As ShipCycle understands it, NorthStar's proposed facility is unable to proceed with performance for some time, which is why "the subject aircraft carrier is currently docked in HII's shipyard."  ECF 47 at 50 n.14.  The Government and NorthStar can explain exactly how much additional time (and Government expense) NorthStar will need before it can perform the work it proposed to perform.  Accordingly, the Court should grant ShipCycle's Motion for Judgment on the Administrative Record and award permanent injunctive relief.

Finally, the public interest favors an injunction, particularly where ShipCycle's rejected offer provides an approach that would be ████████████ NorthStar's, at a price that is more than ██████ lower.

## CONCLUSION AND PRAYER FOR RELIEF

ShipCycle has demonstrated entitlement to a permanent injunction based on its success on the merits of its protest and the balance of harms among the parties and the public. For the foregoing reasons, ShipCycle respectfully requests that the Court GRANT its Motion for Judgment on the Administrative Record.

Dated:  October 17, 2025

Respectfully submitted,

Damien C. Specht
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Telephone: (202) 791-8585
Facsimile: (202) 887-0763

*Attorney of Record for EnergySolutions Federal Support, LLC*

Of Counsel:

James A. Tucker
Victoria Dalcourt Angle
Thomas Lee
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Email: JTucker@mofo.com
        VDalcourt@mofo.com
        TLee@mofo.com

28